[No. S132972. Feb. 1, 2007.]

VINEYARD AREA CITIZENS FOR RESPONSIBLE GROWTH, INC., et al., Plaintiffs and Appellants, v.
CITY OF RANCHO CORDOVA, Defendant and Respondent;
SUNRISE DOUGLAS PROPERTY OWNERS ASSN. et al., Real Parties in Interest and Respondents.

414

416

418

**COUNSEL**

Law Office of Stephan C. Volker, Stephan C. Volker, Joshua A. H. Harris, Marnie E. Riddle and Gretchen E. Dent for Plaintiffs and Appellants.

Bill Lockyer, Attorney General, Manuel M. Medeiros, State Solicitor General, Tom Greene, Chief Assistant Attorney General, J. Matthew Rodriquez and Theodora Berger, Assistant Attorneys General, Susan Durbin and Gordon Burns, Deputy Attorneys General, for The People of the State of California as Amicus Curiae on behalf of Plaintiffs and Appellants.

Law Offices of Thomas N. Lippe and Thomas N. Lippe for California Oak Foundation as Amicus Curiae on behalf of Plaintiffs and Appellants.

Rossmann and Moore, Antonio Rossmann, Robert B. Moore and David R. Owen for The Planning and Conservation League as Amicus Curiae on behalf of Plaintiffs and Appellants.

Brandt-Hawley Law Group and Susan Brandt-Hawley for Stanislaus Natural Heritage Project as Amicus Curiae on behalf of Plaintiffs and Appellants.

Daniel P. Selmi; Chatten-Brown & Carstens, Jan Chatten-Brown and Douglas P. Carstens for Environmental Defense Center, Santa Clarita Organization for Planning the Environment and Friends of the Santa Clara River as Amici Curiae on behalf of Plaintiffs and Appellants.

Lawrence Bragman for City of Fairfax as Amicus Curiae on behalf of Plaintiffs and Appellants.

Meyers, Nave, Riback, Silver & Wilson, Steven R. Meyers, Julia L. Bond and Andrea J. Saltzman for Defendant and Respondent.

Remy, Thomas, Moose and Manley, James G. Moose, Sabrina V. Teller, Meghan M. Habersack and Megan M. Quinn for Real Parties in Interest and Respondents.

Morrison & Foerster, Michael H. Zischke, R. Clark Morrison and Scott B. Birkey for California State Association of Counties and League of California Cities as Amici Curiae on behalf of Defendant and Respondent.

Bingham McCutchen and Stephen L. Kostka for Building Industry Association for California, Consulting Engineers and Land Surveyors of California, Building Industry Legal Defense Foundation, California Business Properties Association and California Association of Realtors as Amici Curiae on behalf of Defendant and Respondent and Real Parties in Interest and Respondents.

Downey Brand, Jennifer L. Harder and Scott L. Shapiro for North State Building Industry Association as Amicus Curiae on behalf of Defendant and Respondent and Real Parties in Interest and Respondents.

Thomas Cumpston; Somach, Simmons & Dunn, Sandra K. Dunn and Jacqueline L. McDonald for El Dorado Irrigation District as Amicus Curiae on behalf of Defendant and Respondent and Real Parties in Interest and Respondents.

Bartkiewicz, Kronick & Shanahan, Ryan S. Bezerra, Paul M. Bartkiewicz and Joshua M. Horowitz for Regional Water Authority as Amicus Curiae on behalf of Defendant and Respondent and Real Parties in Interest and Respondents.

Robert A. Ryan, Jr., County Counsel (Sacramento) and Krista C. Whitman, Deputy County Counsel, for County of Sacramento and Sacramento County Water Agency as Amici Curiae on behalf of Defendant and Respondent and Real Parties in Interest and Respondents.

Kronick, Moskovitz, Tiedemann & Girard, Clifford W. Schulz; Best Best & Krieger and Roderick E. Walston for Association of California Water Agencies and State Water Contractors as Amici Curiae on behalf of Defendant and Respondent and Real Parties in Interest and Respondents.

OPINION

WERDEGAR, J.—The County of Sacramento (County) approved a community plan for a large, mixed-use development project proposed by real parties in interest in this mandate action (real parties), as well as a specific plan for the first portion of that development. A group of objectors to the development (plaintiffs) brought a petition for writ of mandate to overturn, on a variety of grounds, the County's approval. The superior court denied the petition, and the Court of Appeal affirmed.

We granted review to consider plaintiffs' claims, arising under the California Environmental Quality Act (CEQA) (Pub. Resources Code, § 21000 et seq.), that (1) the environmental impact report (EIR) prepared for the community and specific plans failed to adequately identify and evaluate future water sources for the development, and (2) potential impacts on migratory salmon in the Cosumnes River, disclosed in the final EIR, should instead have been incorporated in a revised draft EIR and recirculated for public comment.

We conclude that while the EIR adequately informed decision makers and the public of the County's plan for near-term provision of water to the development, it failed to do so as to the long-term provision and hence failed to disclose the impacts of providing the necessary supplies in the long term. While the EIR identifies the intended water sources in general terms, it does not clearly and coherently explain, using material properly stated or incorporated in the EIR, how the long-term demand is likely to be met with those sources, the environmental impacts of exploiting those sources, and how those impacts are to be mitigated. On the second issue, we agree with plaintiffs that the draft EIR must be revised and recirculated for public comment on the newly disclosed potential impact on Cosumnes River fish migration.

FACTUAL AND PROCEDURAL BACKGROUND

The facts are drawn from the record before the County's Board of Supervisors (Board) when that body took the challenged actions. (See *Western States Petroleum Assn. v. Superior Court* (1995) 9 Cal.4th 559, 568–574 [38 Cal.Rptr.2d 139, 888 P.2d 1268].)

Real parties, a land development group led by AKT Development Corporation, propose to develop more than 6,000 rural acres in the eastern part of the County (now within the jurisdiction of the recently incorporated City of Rancho Cordova (Rancho Cordova), which has assumed the County's place in this litigation) into a "master planned community" known as Sunrise

Douglas (after Sunrise Boulevard and Douglas Road, two major roads forming part of its borders). Fully built, the project would include more than 22,000 residential units, housing as many as 60,000 people, together with schools and parks, as well as office and commercial uses occupying about 480 acres of land.

County planning staff prepared two plans for initial regulatory approval: the Sunrise Douglas Community Plan (Community Plan), which sets out the "policy framework and conceptual development plan" for the entire project, and the SunRidge Specific Plan (Specific Plan), which details the proposed development of a substantial portion of the project—2,600 acres of land to contain 9,886 residential units, as well as community commercial areas, shopping centers, neighborhood schools and parks. County staff also prepared a single EIR assessing the likely environmental consequences of implementing both plans, to be used by the Board in deciding whether to approve the plans.

On July 17, 2002, the Board passed resolutions and ordinances that amended the County general plan and zoning ordinances to approve the project. The Board also certified the final EIR (FEIR) and made findings as to significant unmitigated environmental effects and overriding benefits. (See Pub. Resources Code, § 21081; Guidelines for the Implementation of Cal. Environmental Quality Act (CEQA Guidelines) (Cal. Code Regs., tit. 14, §§ 15090, 15091.)

The EIR for the Community Plan and Specific Plan addressed myriad potential environmental impacts associated with the development, as well as mitigation measures and alternatives to the development. Many of these formed the basis for critical public comment on the draft EIR[1] and disputes at earlier stages of the litigation, but this court's review of the EIR's adequacy is focused solely on issues of water supply and the impact of groundwater withdrawals on Cosumnes River fish migration. Our factual summary therefore also addresses only these two points.

*Water Supply: Sources, Impacts and Mitigation Measures*

According to the FEIR, the average water demand in the Specific Plan area, on full build-out, is estimated to be 8,539 acre-feet annually (afa); demand in the remainder of the Community Plan area is estimated at 13,564

---

[1] We refer to the "Revised Recirculated Draft Environmental Impact Report" for the Community Plan and Specific Plan, publicly circulated on May 18, 2001, as the draft EIR. A different draft EIR, addressing, inter alia, a different water supply plan, circulated in 1999 but was superseded by the 2001 draft EIR and is not at issue in this case. The FEIR was publicly circulated on November 16, 2001.

afa, giving a total project demand, when fully built and occupied, of about 22,103 afa. The plan for supplying this water relies on both groundwater and surface water supplies. Initially, groundwater in an amount eventually reaching about 5,527 afa would be provided from a newly developed source, the North Vineyard Well Field (Well Field), to be built southwest of the development. The Well Field is thought to have a safe yield of about 10,000 afa, but that full amount would not necessarily be available to Sunrise Douglas. The project's additional needs, beyond those supplied from the Well Field, would later be met with surface water diverted from the American River. Both the ground and surface water supplies would be delivered by the Sacramento County Water Agency (the Water Agency).

The Water Agency, according to the FEIR, will provide the surface water supplies as part of its system for a larger area of the County known as zone 40, which, as expanded in 1999, includes the Sunrise Douglas project area. This water will be employed in "conjunctive use" with the Well Field groundwater, employing more surface water in wet years (allowing the groundwater resources to be recharged) and more groundwater in dry years when surface supplies are restricted. The Water Agency has an existing contract with the federal Bureau of Reclamation for 15,000 afa of American River water for use in zone 40 (an allocation referred to in the FEIR and by the parties as Fazio water) and is negotiating or exploring other surface water diversion rights.

The FEIR relied to a significant extent on prior water supply planning completed under the aegis of the Water Forum, a group of public and private "stakeholders"—including the County, the City of Sacramento, other water providers, business groups and environmental organizations (among them the Environmental Council of Sacramento, a plaintiff here), that undertook long-term planning to meet increased demand for American River water through the year 2030. The Water Forum's product, the Water Forum proposal, which became the Water Forum agreement on execution by the participants, includes plans for increased surface water diversions by several water purveyors, including new diversions by the County and the Water Agency by the year 2030 totaling as much as 78,000 afa; used conjunctively with groundwater, this surface water is intended to meet the County's need for new water supplies in the zone 40 area.

The final EIR for the Water Forum proposal extensively analyzed the environmental impacts of the participants' planned increases in surface water diversion, as well as the cumulative impacts of the proposal and other foreseeable changes in area water supply and demand. It found that in spite of measures included in the proposal for water conservation, conjunctive use and fisheries protection, increased use of American River water under the

plan is likely to cause "significant and potentially significant impacts within the Lower American River and Folsom Reservoir, including effects to certain fisheries, recreational opportunities, and cultural resources." In addition, "impacts to water supply, water quality and power supply" are likely to occur outside the American River system.

The impacts of groundwater withdrawals at the Well Field, the other source of water for the development, are discussed in the FEIR for the Community and Specific Plans. The FEIR analyzes a set of seven groundwater withdrawal scenarios to satisfy Specific Plan area and other regional needs, ranging between 2,265 afa and 32,821 afa. According to the FEIR's modeling analysis, groundwater elevations in the shallow aquifer near the Well Field would decline by 10 to 15 feet—deemed a potentially significant amount because it could affect adjacent landowners' domestic wells—under the scenarios involving the project's use of around 10,000 afa of groundwater from the Well Field.[2] This potential impact would be mitigated by conjunctive use of surface water supplies to recharge the aquifer and, if necessary, by deepening domestic wells or connecting their users to the municipal supply.

Because the Sunrise Douglas development does not have legal rights to the projected Well Field and surface water resources, and transmission and treatment facilities have not yet been built, the FEIR contemplates that legal entitlements for development must await final agreements and facilities financing. The FEIR's mitigation measure WS-1 specifies that entitlements ("subdivision maps, parcel maps, use permits, building permits, etc.") in Sunrise Douglas shall not be granted "unless agreements and financing for supplemental water supplies are in place."

### Cosumnes River: Impact on Salmon Migration

The Cosumnes River lies south of the Well Field. The only remaining undammed river draining the Sierra Nevada's western slope, the Cosumnes supports steelhead trout and fall-run chinook salmon populations. The draft EIR did not discuss the impact groundwater extraction at the Well Field would have on the river's flows and habitats. In public comments on the draft EIR, however, several agencies, organizations and individuals expressed concern on the subject.

---

[2] Both a shallow aquifer and a deeper one underlie the Well Field area. The Well Field would draw from the deeper aquifer, resulting in local depression of that aquifer's level, but the FEIR considers this less potentially significant than the effect on the shallow aquifer because the municipal wells drawing from the deeper aquifer, unlike the domestic wells in the shallow aquifer, are already sufficiently deep to be unaffected by lowered levels.

The FEIR also analyzed possible effects of Well Field extraction on known plumes of groundwater contaminants in the area. No significant impact was projected under the relevant scenarios.

The United States Fish and Wildlife Service noted that past groundwater withdrawals had significantly lowered groundwater levels in the area, which causes loss of flow in the Cosumnes River due to seepage through the riverbed and thus limits access of adult fall-run chinook to their spawning grounds. "Any further withdrawals will almost certainly exacerbate this situation." The Fish and Wildlife Service comment urged an analysis of the potential effect of groundwater withdrawals on flow conditions in the river's spawning reach (between LaTrobe and Dillard Roads) and migratory reach (from the tidal zone to LaTrobe Road) during the fall and winter months.

The National Marine Fisheries Service observed that the Cosumnes River is designated critical habitat for the Central Valley steelhead trout, a "federally listed" species, as well as habitat for a "candidate species," fall/late fall-run chinook salmon. Further groundwater withdrawals in the area could reduce surface flow, "significantly impacting recovery of listed and sensitive salmonid species."

The Nature Conservancy, which manages the Cosumnes River Preserve (an area of 30,000 acres in which several state and federal agencies hold land interests), similarly observed that due to the lowering of the groundwater table the Cosumnes River now loses surface flow to groundwater, and, as a consequence, "the river ceases flowing earlier in the year, stays dry longer into the Fall, and dries over an increasingly long reach, compared to historic conditions." Because water from fall rains must saturate an increasingly dry riverbed, significantly more fall water is now required for surface flows to reach the Sacramento San Joaquin Delta and permit salmon migration; riparian habitats and seasonal wetlands are also adversely affected. "Any increment of further lowering of groundwater will, in our view, have a significantly negative effect on these habitat and public trust values."

Graham Fogg, a professor of hydrogeology at the University of California, Davis, who has studied the effects of groundwater extraction on the Cosumnes River, also warned that increased extraction could reduce stream flows, jeopardizing salmon migration. In particular, Fogg explained that while some reaches of the Cosumnes River are hydrologically disconnected from the aquifer in the region, modeling and field observations show a potential for connection "upstream of Dillard Road and downstream of Highway 99."

In response to these public comments, the FEIR states that "available data suggest groundwater extraction at the proposed [W]ell [F]ield will not significantly impact flows in either Deer Creek [a tributary of the Cosumnes] or the Cosumnes River." The estimated impact on groundwater levels in the Cosumnes River area is less than five feet. Moreover, the deep aquifer from which the Well Field would draw is hydrologically disconnected from the

Cosumnes River over most of its reach in the County. In the unconnected reaches, seepage from the river occurs whatever the regional groundwater elevation; further extraction would therefore have no effect on river flows. Hydrological connections exist "upstream of Dillard Road and downstream of Twin Cities Road" ("about 7 miles downstream of Highway 99"), but groundwater elevation changes in those reaches is expected to be no more than two feet and typically less than one foot. The FEIR concludes: "The resulting impact on depletions from Deer Creek and the Cosumnes River is not considered significant. Correspondingly, these depletions are expected to result in small but uncertain impacts on flows in Deer Creek and the Cosumnes River. The potential exception could be during periods of very low flow. During such periods of low flow, these depletions could change the timing and areal extent of the dewatering of the stream invert, potentially impacting aquatic and riparian-dependent species and habitat."

The FEIR response also observed that the proposed extraction of 10,000 afa from the Well Field represented less than a 3 percent increase in the annual groundwater extraction underlying and adjacent to the Cosumnes River, and that agricultural wells located very close to the river and drawing from the region's shallower aquifer "exert a much greater influence on local groundwater elevations and gradients than the proposed [W]ell [F]ield."

### Lower Court Review

The superior court denied plaintiffs' petition for writ of mandate, which challenged the County's CEQA findings and approval of the project. The Court of Appeal affirmed, holding, inter alia, that the FEIR's water supply discussion satisfied CEQA because it did not rely on speculative or illusory sources, and that substantial evidence supported the County's finding the impact of groundwater extraction on flow levels in the Cosumnes River would be insignificant. We granted plaintiffs' petition for review.

### DISCUSSION

In reviewing an agency's compliance with CEQA in the course of its legislative or quasi-legislative actions, the courts' inquiry "shall extend only to whether there was a prejudicial abuse of discretion." (Pub. Resources Code, § 21168.5.)[3] Such an abuse is established "if the agency has not proceeded in a manner required by law or if the determination or decision is not supported by substantial evidence." (§ 21168.5; see *Western States Petroleum Assn. v. Superior Court, supra,* 9 Cal.4th at p. 568; *Laurel Heights Improvement*

---

[3] All further unspecified statutory references are to the Public Resources Code.

*Assn. v. Regents of University of California* (1988) 47 Cal.3d 376, 392–393 [253 Cal.Rptr. 426, 764 P.2d 278] (*Laurel Heights I*).)[4]

An appellate court's review of the administrative record for legal error and substantial evidence in a CEQA case, as in other mandamus cases, is the same as the trial court's: The appellate court reviews the agency's action, not the trial court's decision; in that sense appellate judicial review under CEQA is de novo. (*County of Amador v. El Dorado County Water Agency, supra,* 76 Cal.App.4th at p. 946; *Friends of the Old Trees v. Department of Forestry & Fire Protection* (1997) 52 Cal.App.4th 1383, 1393 [61 Cal.Rptr.2d 297]; *Sierra Club v. County of Sonoma* (1992) 6 Cal.App.4th 1307, 1321 [8 Cal.Rptr.2d 473]; *City of Carmel-by-the-Sea v. Board of Supervisors* (1986) 183 Cal.App.3d 229, 239 [227 Cal.Rptr. 899].) We therefore resolve the substantive CEQA issues on which we granted review by independently determining whether the administrative record demonstrates any legal error by the County and whether it contains substantial evidence to support the County's factual determinations.

## I. *Adequacy of the FEIR's Water Supply Analysis*

Plaintiffs contend the FEIR is deficient in that it "fails to identify the actual source of most of the water needed to fill the project's long-term demand," an analytical gap that "serves to obscure the undisclosed environmental impacts of the project." The County's assurance, through the FEIR's mitigation measure WS-1, that development entitlements will not be granted until agreements and financing for water supplies are in place does not remedy the deficiency, plaintiffs argue. Rather, the promise of future environmental analysis merely sidesteps the County's obligation to disclose and consider the impacts of supplying water to the entire planned Sunrise Douglas project at the outset, before approving that project. Moreover, plaintiffs maintain, insofar as the FEIR relies on mitigation measures proposed in the Water Forum proposal, those are legally inadequate to support approval of the Sunrise Douglas project because they have not been embodied in a legally enforceable agreement.

Relying in part on the FEIR's use of information drawn from the Water Forum proposal's final EIR, the Court of Appeal held the FEIR's treatment of

---

[4] Although the resolutions and ordinances by which the Board approved the Community and Specific Plans appear to have been legislative rather than quasi-judicial acts, the writ petition was styled as for administrative mandamus (Code Civ. Proc., § 1094.5) as well as traditional mandamus (*id.,* § 1085). The parties have not briefed the question of which remedial scheme applies, but, as we have noted before (*Laurel Heights I, supra,* 47 Cal.3d at p. 397, fn. 5), the substantial evidence standard applies to review of the Board's factual determinations under either analysis. (See Pub. Resources Code, §§ 21168, 21168.5; see also *County of Amador v. El Dorado County Water Agency* (1999) 76 Cal.App.4th 931, 945 [91 Cal.Rptr.2d 66] [distinction between these provisions is " 'rarely significant' "].)

water sources and impacts satisfied CEQA's requirements. The identified sources "were not speculative, although they were not completed." Unlike the reliance on "*illusory* supplies" condemned in earlier appellate decisions, the Court of Appeal concluded, here the FEIR identified and assessed the impacts of using "*future* water supplies." Real parties and Rancho Cordova, similarly, contend the FEIR adequately identified and addressed future water supplies. CEQA, Rancho Cordova argues, requires only that the County "use its best efforts to disclose all that [it] reasonably could, not to actually secure a water source and work out all the uncertainties and competing demands before an environmental review would be adequate."

### A. Principles Governing CEQA Analysis of Water Supply

■ The fundamental purpose of an EIR is "to provide public agencies and the public in general with detailed information about the effect which a proposed project is likely to have on the environment." (§ 21061.) To that end, the EIR "shall include a detailed statement setting forth . . . [¶] . . . [a]ll significant effects on the environment of the proposed project." (§ 21100, subd. (b)(1).) It is common ground for the parties and the lower court that the EIR in this case was required to analyze the effects of providing water to this large housing and commercial development, and that in order to do so the EIR had, in some manner, to identify the planned sources of that water. The principal disputed issue is how firmly future water supplies for a proposed project must be identified or, to put the question in reverse, what level of uncertainty regarding the availability of water supplies can be tolerated in an EIR for a land use plan.

Neither CEQA itself, nor the CEQA Guidelines,[5] nor any of this court's decisions address this question specifically. On a general level, section 15144 of the CEQA Guidelines, addressing the need to forecast future events in an EIR, states that "[w]hile foreseeing the unforeseeable is not possible, an agency must use its best efforts to find out and disclose all that it reasonably can." We endorsed this view in *Laurel Heights I, supra,* 47 Cal.3d at pages 398–399, explaining that an EIR must address the impacts of "reasonably foreseeable" future activities related to the proposed project. The Courts of Appeal, however, have in several decisions specifically addressed the sufficiency of an EIR's analysis of future water supplies.

---

[5] The CEQA Guidelines, promulgated by the state's Resources Agency, are authorized by Public Resources Code section 21083. In interpreting CEQA, we accord the Guidelines great weight except where they are clearly unauthorized or erroneous. (*Laurel Heights Improvement Assn. v. Regents of University of California* (1993) 6 Cal.4th 1112, 1123, fn. 4 [26 Cal.Rptr.2d 231, 864 P.2d 502] (*Laurel Heights II*); *Bakersfield Citizens for Local Control v. City of Bakersfield* (2004) 124 Cal.App.4th 1184, 1197 [22 Cal.Rptr.3d 203].)

In *Santiago County Water Dist. v. County of Orange* (1981) 118 Cal.App.3d 818 [173 Cal.Rptr. 602], the EIR for a proposed mining project stated that the mine would consume 12,000 to 15,000 gallons of water daily and that the local water district would supply it, but provided no information as to the impacts on water service elsewhere of supplying that amount of water to the mine. (*Id.* at pp. 830–831.) The Court of Appeal held that without any "facts from which to evaluate the pros and cons of supplying the [needed] amount of water" to the mine (*id.* at p. 829), the EIR was inadequate.

Long-term supplies for a large project—a residential community and resort to be developed over 25 years—were addressed in *Stanislaus Natural Heritage Project v. County of Stanislaus* (1996) 48 Cal.App.4th 182 [55 Cal.Rptr.2d 625] (*Stanislaus Natural Heritage*). The EIR noted that " '[a] firm water supply has not yet been established beyond the first five years of development, although the applicant is pursuing several sources.' " (*Id.* at p. 195.) Although the EIR listed several possible sources of long-term water supply (*id.* at p. 194), it provided no analysis of the likelihood of their materializing and their environmental impacts if employed. Instead, the EIR deferred such analysis to future environmental review of water acquisitions or " 'detailed project-level review for future phases of development,' " providing as a mitigation measure that if the applicant failed to demonstrate and analyze the impacts of future water supplies, further phases of the development would not be approved. (*Id.* at p. 195.)

The appellate court held this treatment of future water supplies defeated CEQA's fundamental informational purpose. Before approving a specific plan for an entire development, the decision makers must be informed of the intended source or sources of water for the project, "what the impact will be if supplied from a particular source or possible sources and if that impact is adverse how it will be addressed." (*Stanislaus Natural Heritage, supra*, 48 Cal.App.4th at p. 206.) CEQA, the court recognized, permits the environmental analysis for long-term, multipart projects to be "tiered," so that the broad overall impacts analyzed in an EIR at the first-tier programmatic level need not be reassessed as each of the project's subsequent, narrower phases is approved,[6] but tiering "is not a device for deferring the identification of significant environmental impacts that the adoption of a specific plan can be expected to cause." (*Stanislaus Natural Heritage*, at p. 199.) Nor can the unanalyzed impacts of unknown water sources be mitigated by providing that if water proves unavailable, the project's future phases will not be built: "While it might be argued that not building a portion of the project is the ultimate mitigation, it must be borne in mind that the EIR must address the project and assumes the project will be built." (*Id.* at p. 206.)

---

[6] See Public Resources Code sections 21068.5, 21093, 21094; CEQA Guidelines, California Code of Regulations, title 14, section 15152. We discuss tiering further below.

In *Santa Clarita Organization for Planning the Environment v. County of Los Angeles* (2003) 106 Cal.App.4th 715 [131 Cal.Rptr.2d 186] (*Santa Clarita*), the EIR for a residential and commercial development project, for which the Castaic Lake Water Agency (Castaic) was to supply water, relied for analysis of cumulative development impacts on Castaic receiving its full entitlement of 54,200 afa from the State Water Project and purchasing an additional 41,000 afa in State Water Project water rights from another agency. (*Id.* at pp. 718–719.) Quoting another appellate court's recent observation that because the State Water Project had never been fully constructed "there is a huge gap between what is promised and what can be delivered," rendering State Water Project entitlements nothing more than "hopes, expectations, water futures or, as the parties refer to them, 'paper water' " (*Planning & Conservation League v. Department of Water Resources* (2000) 83 Cal.App.4th 892, 908, fn. 5 [100 Cal.Rptr.2d 173]), the *Santa Clarita* court held the EIR's water supply discussion was inadequate because of its assumption that "100 percent of Castaic's [State Water Project] entitlement" would be available to Castaic. (*Santa Clarita*, at p. 722; see also *California Oak Foundation v. City of Santa Clarita* (2005) 133 Cal.App.4th 1219, 1238–1239, 1244 [35 Cal.Rptr.3d 434] (*California Oak*) [disapproving EIR for an industrial park because the water supply analysis relied, without adequate consideration of the attendant uncertainties, on Castaic's purchase of 41,000 afa in imported State Water Project water].)

Finally, *Napa Citizens for Honest Government v. Napa County Bd. of Supervisors* (2001) 91 Cal.App.4th 342 [110 Cal.Rptr.2d 579] (*Napa Citizens*) considered the closely related issue of what constitutes an adequate discussion of contingencies in case the anticipated water supplies for a land use project fail to materialize. The EIR for an industrial development project in Napa County stated that water would be supplied by the City of American Canyon, which already supplied other users in the area. American Canyon's water sources were adequate for planned growth in the short term, but in the longer term would fall short unless that city was able to purchase additional water from the City of Vallejo, as it was trying to do. The EIR assumed that purchase would go through and therefore found the project's demand for water would have no significant impact. (*Id.* at p. 372.) The appellate court held the EIR inadequate for not disclosing possible alternative water sources and their impacts. In light of the uncertainty regarding American Canyon's future supplies, the EIR "cannot simply label the possibility that they will not materialize as 'speculative,' and decline to address it. The County should be informed if other sources exist, and be informed, in at least general terms, of the environmental consequences of tapping such resources." (*Id.* at p. 373.)

While these decisions state no definitive standard of certainty for analysis of future water supplies, they do articulate certain principles for analytical adequacy under CEQA, principles with which we agree. First, CEQA's

informational purposes are not satisfied by an EIR that simply ignores or assumes a solution to the problem of supplying water to a proposed land use project. Decision makers must, under the law, be presented with sufficient facts to "evaluate the pros and cons of supplying the amount of water that the [project] will need." (*Santiago County Water Dist. v. County of Orange, supra,* 118 Cal.App.3d at p. 829.)

■ Second, an adequate environmental impact analysis for a large project, to be built and occupied over a number of years, cannot be limited to the water supply for the first stage or the first few years. While proper tiering of environmental review allows an agency to defer analysis of certain details of later phases of long-term linked or complex projects until those phases are up for approval, CEQA's demand for meaningful information "is not satisfied by simply stating information will be provided in the future." (*Santa Clarita, supra,* 106 Cal.App.4th at p. 723.) As the CEQA Guidelines explain: "Tiering does not excuse the lead agency from adequately analyzing reasonably foreseeable significant environmental effects of the project and does not justify deferring such analysis to a later tier EIR or negative declaration." (Cal. Code Regs., tit. 14, § 15152, subd. (b).) Tiering is properly used to defer analysis of environmental impacts and mitigation measures to later phases when the impacts or mitigation measures are not determined by the first-tier approval decision but are specific to the later phases. For example, to evaluate or formulate mitigation for "site specific effects such as aesthetics or parking" (*id.,* § 15152 [Discussion]) may be impractical when an entire large project is first approved; under some circumstances analysis of such impacts might be deferred to a later-tier EIR.[7] But the future water sources for a large land use project and the impacts of exploiting those sources are not the type of information that can be deferred for future analysis. An EIR evaluating a planned land use project must assume that all phases of the project will eventually be built and will need water, and must analyze, to the extent reasonably possible, the impacts of providing water to the entire proposed project. (*Stanislaus Natural Heritage, supra,* 48 Cal.App.4th at p. 206.)

---

[7] Conversely, once a general project impact has been analyzed in the broadest first-tier EIR, the agency saves time and resources by relying on that first-tier analysis in later, more specific environmental analysis documents, provided of course that passage of time or factors peculiar to the later project phase do not render the first-tier analysis inadequate. (See § 21083.3 [limited analysis required for development project consistent with general or community plan that was subject of earlier EIR]; CEQA Guidelines, Cal. Code Regs., tit. 14, § 15152, subds. (d)–(f).) The *Stanislaus Natural Heritage* court gives the apt example of a set of office building projects: The buildings' traffic impacts and other common environmental impacts would properly be discussed in a first-tier EIR covering the entire set of buildings, a discussion that could be relied upon, rather than repeated, in each of the building-specific environmental evaluations. (*Stanislaus Natural Heritage, supra,* 48 Cal.App.4th at p. 198.) Impacts specific to the individual buildings' designs would properly be analyzed in later-tier documents.

■   Third, the future water supplies identified and analyzed must bear a likelihood of actually proving available; speculative sources and unrealistic allocations ("paper water") are insufficient bases for decisionmaking under CEQA. (*Santa Clarita, supra*, 106 Cal.App.4th at pp. 720–723.) An EIR for a land use project must address the impacts of *likely* future water sources, and the EIR's discussion must include a reasoned analysis of the circumstances affecting the likelihood of the water's availability. (*California Oak, supra*, 133 Cal.App.4th at p. 1244.)

Finally, where, despite a full discussion, it is impossible to confidently determine that anticipated future water sources will be available, CEQA requires some discussion of possible replacement sources or alternatives to use of the anticipated water, and of the environmental consequences of those contingencies. (*Napa Citizens, supra*, 91 Cal.App.4th at p. 373.) The law's informational demands may not be met, in this context, simply by providing that future development will not proceed if the anticipated water supply fails to materialize. But when an EIR makes a sincere and reasoned attempt to analyze the water sources the project is likely to use, but acknowledges the remaining uncertainty, a measure for curtailing development if the intended sources fail to materialize may play a role in the impact analysis. (See *id.* at p. 374.)

Significantly, none of the Court of Appeal decisions on point holds or suggests that an EIR for a land use plan is inadequate unless it demonstrates that the project is definitely assured water through signed, enforceable agreements with a provider and already built or approved treatment and delivery facilities. Requiring certainty when a long-term, large-scale development project is initially approved would likely be unworkable, as it would require water planning to far outpace land use planning.

Examination of other state statutes specifically addressing the coordination of land use and water planning supports our conclusion CEQA should not be understood to require assurances of certainty regarding long-term future water supplies at an early phase of planning for large land development projects. Pertinent are two measures enacted in 2001 "to ensure that local land use authorities will thoroughly consider the availability of water supplies before approving major new developments." (Tepper, *New Water Requirements for Large-Scale Developments* (Jan. 2005) 27 L.A. Law. 18, 20.)

■ Government Code section 66473.7 generally requires a city or county, before approving a subdivision map for a residential development of more than 500 units, to obtain from the applicable public water system a "written verification" that adequate water supplies will be available for that project as well as other existing and planned future uses for a projected 20-year period. When the verification rests on supplies not yet available to the water provider, it is to be based on firm indications the water will be available in the future, including written contracts for water rights, approved financing programs for delivery facilities, and the regulatory approvals required to construct infrastructure and deliver the water. (*Id.*, subd. (d).) The subdivision map may be approved only if the water system verifies, or the city or county finds on substantial evidence, that water supplies will be adequate. (*Id.*, subd. (b); see Tepper, *New Water Requirements for Large-Scale Developments*, *supra*, 27 L.A. Law. at p. 20.) While the verification or finding is *required* as a condition of subdivision approval, "[n]othing in this section shall preclude the [local] legislative body . . . from making the determinations required in this section earlier than" the subdivision approval stage. (Gov. Code, § 66473.7, subd. (*l*).)

■ Water Code sections 10910 to 10912, enacted in 1995 but substantially amended in 2001, apply more broadly to any large land use project (not only residential developments) and to approval of any such project subject to CEQA (not only to subdivision map approvals). (Wat. Code, §§ 10910, subd. (a), 10912, subds. (a), (b).) They require the city or county considering a project to obtain, at the outset of the CEQA process, a water supply "assessment" from the applicable public water system. (Wat. Code, § 10910, subd. (b).) The "water supply assessment" is then to be included in any CEQA document the city or county prepares for the project. (Wat. Code, § 10911, subd. (b).)[8] With regard to *existing* supply entitlements and rights, a water supply assessment must include assurances such as written contracts, capital outlay programs and regulatory approvals for facilities construction (paralleling the assurances Gov. Code, § 66473.7, subd. (d) requires for future water), but as to additional *future* supplies needed to serve the project, the assessment need include only the public water system's plans for acquiring the additional supplies, including cost and time estimates and regulatory approvals the system anticipates needing. (Wat. Code, §§ 10910, subd. (d)(2), 10911, subd. (a).)

■ Taken together, Water Code sections 10910 to 10912 and Government Code section 66473.7 thus demand, as amicus curiae Association of California Water Agencies explains, that "water supplies must be identified with more

---

[8] A section of CEQA, in turn, requires compliance with these Water Code provisions. (Pub. Resources Code, § 21151.9.) The parties agree that the County's compliance with the Water Code requirements is not at issue in this case.

specificity at each step as land use planning and water supply planning move forward from general phases to more specific phases." The plans and estimates that Water Code section 10910 mandates for future water supplies at the time of *any* approval subject to CEQA must, under Government Code section 66473.7, be replaced by firm assurances at the subdivision map approval stage. To interpret CEQA itself as requiring such firm assurances of future water supplies at relatively early stages of the land use planning and approval process would put CEQA in tension with these more specific water planning statutes.

■ Consistent with the foregoing, we emphasize that the burden of identifying likely water sources for a project varies with the stage of project approval involved; the necessary degree of confidence involved for approval of a conceptual plan is much lower than for issuance of building permits. The ultimate question under CEQA, moreover, is not whether an EIR establishes a likely source of water, but whether it adequately addresses the reasonably foreseeable *impacts* of supplying water to the project. If the uncertainties inherent in long-term land use and water planning make it impossible to confidently identify the future water sources, an EIR may satisfy CEQA if it acknowledges the degree of uncertainty involved, discusses the reasonably foreseeable alternatives—including alternative water sources and the option of curtailing the development if sufficient water is not available for later phases—and discloses the significant foreseeable environmental effects of each alternative, as well as mitigation measures to minimize each adverse impact. (§ 21100, subd. (b).) In approving a project based on an EIR that takes this approach, however, the agency would also have to make, as appropriate to the circumstances, any findings CEQA requires regarding incorporated mitigation measures, infeasibility of mitigation, and overriding benefits of the project (§ 21081) as to each alternative prong of the analysis.

■ Moreover, CEQA, in our understanding, does not require a city or county, each time a new land use development comes up for approval, to reinvent the water planning wheel. Every urban water supplier is already required to prepare and periodically update an "urban water management plan," which must, inter alia, describe and project estimated past, present, and future water sources, and the supply and demand for at least 20 years into the future. (Wat. Code, §§ 10620–10631.) When an individual land use project requires CEQA evaluation, the urban water management plan's information and analysis may be incorporated in the water supply and demand assessment required by both the Water Code and CEQA "[i]f the projected water demand associated with the proposed project was accounted for in the most recently adopted urban water management plan." (Wat. Code, § 10910, subd. (c)(2).) Thus the Water Code and the CEQA provision requiring compliance with it (Pub. Resources Code, § 21151.9) contemplate that analysis in an individual

project's CEQA evaluation may incorporate previous overall water planning projections, assuming the individual project's demand was included in the overall water plan.

Finally, before assessing the adequacy of the FEIR's water supply analysis, we pause to clarify the nature of our review. As explained earlier, an agency may abuse its discretion under CEQA either by failing to proceed in the manner CEQA provides or by reaching factual conclusions unsupported by substantial evidence. (§ 21168.5.) Judicial review of these two types of error differs significantly: While we determine de novo whether the agency has employed the correct procedures, "scrupulously enforc[ing] all legislatively mandated CEQA requirements" (*Citizens of Goleta Valley v. Board of Supervisors* (1990) 52 Cal.3d 553, 564 [276 Cal.Rptr. 410, 801 P.2d 1161]), we accord greater deference to the agency's substantive factual conclusions. In reviewing for substantial evidence, the reviewing court "may not set aside an agency's approval of an EIR on the ground that an opposite conclusion would have been equally or more reasonable," for, on factual questions, our task "is not to weigh conflicting evidence and determine who has the better argument." (*Laurel Heights I, supra,* 47 Cal.3d at p. 393.)

In evaluating an EIR for CEQA compliance, then, a reviewing court must adjust its scrutiny to the nature of the alleged defect, depending on whether the claim is predominantly one of improper procedure or a dispute over the facts. For example, where an agency failed to require an applicant to provide certain information mandated by CEQA and to include that information in its environmental analysis, we held the agency "failed to proceed in the manner prescribed by CEQA." (*Sierra Club v. State Bd. of Forestry* (1994) 7 Cal.4th 1215, 1236 [32 Cal.Rptr.2d 19, 876 P.2d 505]; see also *Santiago County Water Dist. v. County of Orange, supra,* 118 Cal.App.3d at p. 829 [EIR legally inadequate because of lack of water supply and facilities analysis].) In contrast, in a factual dispute over "whether adverse effects have been mitigated or could be better mitigated" (*Laurel Heights I, supra,* 47 Cal.3d at p. 393), the agency's conclusion would be reviewed only for substantial evidence. Thus, in *Laurel Heights I,* we rejected as a matter of law the agency's contention that the EIR did not need to evaluate the impacts of the project's foreseeable future uses because there had not yet been a formal decision on those uses (*id.* at pp. 393–399), but upheld as supported by substantial evidence the agency's finding that the project impacts described in the EIR were adequately mitigated (*id.* at pp. 407–408). (See also *California Oak, supra,* 133 Cal.App.4th at p. 1244 [absent uncertain purchase of additional water, as to which the EIR's discussion is legally inadequate, "substantial evidence of sufficient water supplies does not exist"].)

## B. *The FEIR's Analysis of Near-term Groundwater Supplies*

As previously described, the Sunrise Douglas Community and the SunRidge Specific Plan proposed to rely initially on between 5,000 and 10,000 afa of the groundwater to be extracted at the Well Field, a new well facility drawing from the region's deeper aquifer; the FEIR analyzed the impacts and needed mitigation of such extraction. Plaintiffs contend competing identified uses for the Well Field water, in particular growth in the Mather Field, Sunrise Corridor and Security Park areas of the County and the replacement of contaminated groundwater sources serving those areas, are likely to use the full 10,000 afa capacity of the Well Field, making the planned use of the same water for the Sunrise Douglas development "completely out of the question." As a result, plaintiffs argue, the Sunrise Douglas project will need instead to employ some other, unknown near-term water source, the impacts of which have not been analyzed.[9]

As explained above, we review solely for substantial evidence the County's factual conclusion that 5,000 afa or more of Well Field water will be available for Sunrise Douglas. We disagree with plaintiffs that the FEIR's analysis of near-term water supply is inadequate on this ground.

The FEIR noted that "capacity would not be reserved in the [Well Field] for any specific user; capacity would simply be available to users on a 'first-come, first-served' basis, since the [Well Field] would be a public water facility"; acknowledged that existing and new demand in the Mather Field, Sunrise Corridor and Security Park areas might also be satisfied from the Well Field; and made clear that serving all these demands as well as a significant portion of the Sunrise Douglas project from the Well Field would require much more water than the 10,000 afa that source can safely provide. Nothing plaintiffs cite in the administrative record, however, demonstrates that these competing demands can be satisfied *only* from the Well Field or that they will all materialize in full in the near term and have priority over the Sunrise Douglas project. Uncertainty in the form of competition for identified water sources is an important point that should be discussed in an EIR's water supply analysis—and was here—but it does not necessarily render development of the planned water supply too unlikely.

In fact, the record indicates that a substantial portion of the projected Well Field water is likely to be used for the Sunrise Douglas project. The FEIR

---

[9] Plaintiffs also contend extraction from the Well Field will be limited by a regional groundwater cap of 273,000 afa set under the Water Forum agreement. As Rancho Cordova explains, however, that limit was set at the projected 2005 level of groundwater withdrawals and may include projected growth in the Sunrise Douglas area. According to discussion at a 2002 public hearing on the project, taking 10,000 afa from the Well Field would bring total area groundwater withdrawals to about 260,000 afa.

explains that the initial phase of Well Field construction (three wells, pumping about 2,265 afa) would include a pipeline connecting the wells to the Sunrise Douglas project's water distribution system and to a storage tank located at Sunrise Boulevard and Douglas Road. Those facilities would be constructed and operational within an estimated 18 months of project approval. Only with the second phase of construction (three additional wells pumping about 3,262 afa) would the Well Field be connected to the Water Agency's larger zone 40 system, where it might also serve other users. The County's findings also state that developers within the Specific Plan area will be required to pay a per unit fee to purchase insurance for compensation of any Well Field neighbors whose wells fail as a result of the project.

With regard to competition from other planned development, the findings state that already entitled development is expected to call, in the following six years, on about 3,000 of the Well Field's 10,000 afa production, leaving about 7,000 afa—more than the FEIR's projected near-term usage of about 5,500 afa—for "development within the SunRidge Specific Plan area." With regard to replacement of contaminated groundwater, both the FEIR and the findings refer to other remediation and replacement efforts not involving Well Field water; what approaches will be taken and how successful they will be appear partly unknown.

While much uncertainty remains, then, the record contains substantial evidence demonstrating a reasonable likelihood that a water source the provider plans to use for the Sunrise Douglas project—a source that will initially be connected only to the Sunrise Douglas project, for which the Sunrise Douglas project developers will pay a special insurance fee, and which is not already allocated to other entitled uses—will indeed be available at least in substantial part to supply the Sunrise Douglas project's near-term needs.

Nor did the County, in this instance, fail to proceed in the manner required by CEQA. With regard to the near-term exploitation of groundwater from the Well Field, the FEIR neither improperly used tiering to defer all analysis of supplies to future stages of the project, as in *Stanislaus Natural Heritage, supra*, 48 Cal.App.4th 182, nor relied upon demonstrably illusory supplies, as in *Santa Clarita, supra*, 106 Cal.App.4th 715, and *California Oak, supra*, 133 Cal.App.4th 1219. Although the FEIR did not demonstrate a level of certainty regarding future supplies comparable to that required for subdivision approval under Government Code section 66473.7, CEQA does not demand such certainty at the relatively early planning stage involved here.

The Attorney General, as amicus curiae in support of plaintiffs, points out that the Specific Plan occupies a later land use planning stage than the

Community Plan and that, under Government Code section 65457, a subdivision application consistent with the Specific Plan would not require further CEQA analysis unless substantial changes had occurred to the project or the surrounding circumstances, or new information had surfaced about the project's impacts (see Pub. Resources Code, § 21166). Nonetheless, to satisfy CEQA, an EIR for a specific plan need not demonstrate certainty regarding the project's future water supplies. To the extent a subsequent subdivision proposal relies on different water sources than were proposed in the specific plan it implements, or the likely availability of the intended water sources has changed between the time of the specific plan and the subdivision application (or more has been learned about the impacts of exploiting those sources), changes in the project, the surrounding circumstances or the available information would exist within the meaning of section 21166, requiring additional CEQA analysis under that section and Government Code section 65457. In holding the FEIR's analysis of supplying water to the Specific Plan area from the Well Field satisfies CEQA, therefore, we do not imply that the FEIR's analysis would suffice for approval of a future subdivision application proposing to use different or additional near-term water sources.

### C. *Long-term Surface Water Supplies*

With regard to the long-term provision of surface water supplies to the project, plaintiffs again stress the competing demands for new water in the County, including other planned growth and the replacement of contaminated groundwater. They first note that the only assured source of new surface water supplies, 15,000 afa in federal Fazio water (not all of which is yet available for diversion), is clearly inadequate to meet long-term water demand in the southern part of the County. In so arguing, however, plaintiffs seemingly ignore the additional planned surface water supplies disclosed in the Water Forum proposal and the FEIR. True, those supplies are not *certain* to materialize: even the Fazio water may in practice be limited to something less than 15,000 afa by lack of adequate diversion and transmission facilities, while neither binding contracts nor established facilities financing has been demonstrated for the remaining new surface water. But as we have seen, CEQA does not require this level of certainty at planning stages prior to approval of permits, subdivision maps or other development entitlements. (Cf. Gov. Code, § 66473.7, subd. (d) [detailed verification of future supplies required at subdivision approval stage].) The FEIR discloses the remaining uncertainty regarding actual provision of surface water, noting that "provision of a long-term reliable water supply . . . cannot be ensured until facilities are approved." The EIR thus contains substantial evidence to support the conclusion that *some part* of the planned new surface water supplies will be developed and made available to the Water Agency for use in its zone 40.

Plaintiffs are correct, however, that the FEIR's discussion of the *total* long-term water supply and demand in the Water Agency's zone 40 (which includes the Sunrise Douglas project) leaves too great a degree of uncertainty regarding the long-term availability of water for this project. Factual inconsistencies and lack of clarity in the FEIR leave the reader—and the decision makers—without substantial evidence for concluding that sufficient water is, in fact, likely to be available for the Sunrise Douglas project at full build-out. Most fundamentally, the project FEIR and the Water Forum proposal final EIR provide no consistent and coherent description of the future demand for new water due to growth in zone 40 or of the amount of new surface water that is potentially available to serve that growth.

Regarding demand, the FEIR (in its background water supply discussion) states: "The average water demand to support growth approved in the 1993 General Plan for the Zone 40 area, as expanded, is approximately 113,000 AF/yr." But the Water Forum proposal and its associated final EIR, assertedly working from the same general plan growth projections, provide a lower estimate: 87,000 afa in expanded zone 40 demand by the year 2030. The reason for divergence in these estimates is not explained. Also left unclear is whether these figures represent water demand from expected growth alone or total demand including that from expected growth.

As to supply, the FEIR, relying on the Water Forum proposal, projects new surface water deliveries of "approximately 63,857" afa to the south area of the County (which includes the project and the Well Field), but elsewhere (responding to a comment on the draft EIR) discloses only 45,000 afa of expected new surface water ("15,000 AF/year of 'Fazio' water from the [Central Valley Project]; 30,000 AF/year from an assignment of [the Sacramento Municipal Utility District (SMUD)'s] appropriative water rights on the American River"), plus an "application" for an undisclosed amount of "surplus supplies on the Sacramento River." The final EIR for the Water Forum proposal, however, is more optimistic, disclosing "up to 78,000" afa in new surface water.[10]

The FEIR does not explain the divergence between its estimates and those in the Water Forum proposal, or even the FEIR's own use of divergent new surface water supply figures in different portions of its discussion. In its findings approving the project, the Board used the FEIR's estimated demand

---

[10] The 78,000 afa is made up of 15,000 afa in existing contractual rights to American River diversion (Fazio water), 15,000 afa of SMUD's American River rights as to which the Water Agency and SMUD have reached an agreement in principle, a final 15,000 afa as to which the Water Agency and SMUD are in negotiations, plus 33,000 afa of intermittent water consisting of excess flows on the American and Sacramento Rivers for which the Water Agency is applying.

figure of 113,000 afa and the FEIR's new surface water supply figure of "approximately 63,857" afa, but did not attempt to explain the different estimates appearing elsewhere in the Water Forum proposal and FEIR. An explanation of the differences among these figures may well exist, but it did not appear in the FEIR presented to the public and the Board.

Nor does the FEIR make clear how the available water supply is expected to meet total zone 40 demand over the long term and, hence, why a sufficient amount of the identified water should reasonably be expected to be available for the Sunrise Douglas project. Demand of 113,000 afa "to support growth" obviously cannot be met with new supplies of 63,857 afa. Even using the lowest demand figure of 87,000 afa and the highest new surface water supply figure of 78,000 afa (both drawn from the Water Forum proposal, not from the FEIR), a significant gap remains.

The general answer given in the FEIR, and echoed by real parties and Rancho Cordova, is that the new surface water supplies are to be used conjunctively with groundwater supplies. But this explanation is vague and unquantified. By itself, reliance on "conjunctive use" is inadequate, for, as plaintiffs argue, "CEQA requires more than a reference to a water supply management practice as water supply analysis." How much groundwater, existing and new, will be used with how much new surface water? In what combinations will these sources be used during wet and dry years, respectively? No such description of planned future water use appears in the FEIR. As an amicus curiae observes: "The conjunctive use program . . . lacks quantification, with no analysis that would disclose whether the program will produce sufficient supplies and storage capacity to meet expected demands."

Instead of itself providing an analytically complete and coherent explanation, the FEIR notes that a full analysis of the planned conjunctive use program must await environmental review of the Water Agency's zone 40 master plan update, which was pending at the time the FEIR was released. The Board's findings repeat this explanation. To the extent the FEIR attempted, in effect, to tier from a *future* environmental document, we reject its approach as legally improper under CEQA. If the environmental impact analysis the Water Agency expects to perform on its zone 40 master plan update is important to understanding the long-term water supply for the Sunrise Douglas project, it should be performed in the Sunrise Douglas project FEIR even though that might result in subsequent duplication by the master plan update. If, as Rancho Cordova argues, such duplication would be an impractical waste of resources, the County could instead have deferred analysis and approval of the Sunrise Douglas project until the master plan update analysis was complete, then tiered the project FEIR from the programmatic analysis it performed there. What the County could not do was avoid

full discussion of the likely water sources for the Sunrise Douglas project by referring to a not yet complete comprehensive analysis in the zone 40 master plan update. CEQA's informational purpose "is not satisfied by simply stating information will be provided in the future." (*Santa Clarita, supra,* 106 Cal.App.4th at p. 723.)

A reader of the FEIR, moreover, cannot readily derive the missing quantitative analysis of conjunctive use from the figures provided. The 10,000 afa in new groundwater to be drawn from the Well Field does not appear sufficient to bridge the dry-year gap between new surface water supplies and demand due to zone 40 growth, which appears to be 42,000 afa at a minimum: 45,000 afa in planned dry-year surface water diversion rights versus 87,000 afa in demand (both figures per the Water Forum proposal final EIR). In wet years even less groundwater would be available for extraction, as conjunctive use involves recharging the aquifer in wet years.

To be sure, the County's burden in preparing the FEIR for the Sunrise Douglas project was not necessarily to demonstrate with certainty that the County's total water supply in the year 2030 would be sufficient to meet its total demand, though some discussion of total supply and demand is necessary to evaluate the "long-term cumulative impact of development on water supply." (*Santa Clarita, supra,* 106 Cal.App.4th at p. 719; see also CEQA Guidelines, Cal. Code Regs., tit. 14, § 15130, subd. (b)(1)(B) [cumulative impact analysis may employ projections in general planning documents].) But CEQA did require that the FEIR show a *likelihood* water would be available, over the long term, for this project.[11] Without an explanation that shows at least an approximate long-term sufficiency in total supply, the public and decision makers could have no confidence that the identified sources were actually likely to fully serve this extraordinarily large development project. An EIR that neglects to explain the likely sources of water and analyze their impacts, but leaves long-term water supply considerations to later stages of the project, does not serve the purpose of sounding an " 'environmental "alarm bell" ' " (*Laurel Heights I, supra,* 47 Cal.3d at p. 392) before the project has taken on overwhelming "bureaucratic and financial momentum" (*id.* at p. 395).

In this respect, the FEIR's discussions of near- and long-term water supplies differ significantly. As explained in part I.B. above, the FEIR included substantial evidence that competing users would not deprive the Sunrise Douglas project of most of its planned groundwater from the Well Field. But the FEIR contains *no* evidence, other than the gross demand figures (which are, as noted, inconsistent) regarding the uses that might be

---

[11] Other analytical paths are possible (see *ante,* at p. 434 and *post,* at pp. 446–447) but were not pursued in the FEIR.

expected to compete with Sunrise Douglas for the planned new surface water over the next 20 or more years.

Real parties point to a discussion of conjunctive use in the Water Forum proposal that refers to larger amounts of groundwater than will be drawn from the Well Field. But the origin and precise reference of these figures is not explained, nor is their connection to the demand figures made entirely plain.[12] More important, neither these figures nor any reference to this analysis appears in the FEIR or even, so far as we are able to determine, in the Water Forum proposal's final EIR. A reader of the FEIR could not reasonably be expected to ferret out an unreferenced discussion in the earlier Water Forum proposal, interpret that discussion's unexplained figures without assistance, and spontaneously incorporate them into the FEIR's own discussion of total projected supply and demand. The data in an EIR must not only be sufficient in quantity, it must be presented in a manner calculated to adequately inform the public and decision makers, who may not be previously familiar with the details of the project. "[I]nformation 'scattered here and there in EIR appendices,' or a report 'buried in an appendix,' is not a substitute for 'a good faith reasoned analysis . . . .' " (*California Oak, supra,* 133 Cal.App.4th at p. 1239, quoting *Santa Clarita, supra,* 106 Cal.App.4th at pp. 722–723.) To the extent the County, in certifying the FEIR as complete, relied on information not actually incorporated or described and referenced in the FEIR, it failed to proceed in the manner provided in CEQA.

We do not hold or suggest that the Sunrise Douglas FEIR needed to reproduce or repeat an environmental impact analysis for new surface water supplies already performed in connection with the Water Forum proposal. As discussed in the statement of facts, the final EIR for the Water Forum proposal did discuss the impacts of the planned additional diversions of American River water; indeed, a *summary* of these impacts and the proposed mitigation measures occupies 85 pages of that EIR. The contemplated diversions include additional water for the Water Agency to use in its zone 40 area, which, as noted, includes Sunrise Douglas. To the extent the Community and Specific Plans call for that same surface water to be used by the Sunrise Douglas development, the FEIR could have properly tiered from or incorporated the earlier environmental analysis. CEQA does not require that the information on impacts of diversion laid out in the Water Forum proposal's final EIR be repeated in environmental documents for every development that depends on that water. (See § 21068.5 [through tiering,

---

[12] The Water Forum proposal discussion refers to use of 34,000 afa and 95,100 afa in groundwater in wet and dry years, respectively, as being used conjunctively with new surface water supplies to meet "a total 2030 demand of 117,600" afa for the "South County M & I users group." The exact relationship of this demand figure to those in the FEIR and elsewhere in the Water Forum proposal (113,000 afa and 87,000 afa, respectively) is not clear, and the source of the proposal's groundwater supply figures is not identified.

applicable analysis information in an EIR for a policy or program may be incorporated by reference in later narrow or site-specific project EIR's].)[13]

The FEIR did not, however, make sufficiently clear its relationship with the Water Forum proposal's environmental impact analysis. Although the FEIR's water supply discussion refers at several points to the Water Forum proposal's final EIR, the FEIR does not state that it is tiered from or incorporates parts of the earlier document. In its background discussion, the FEIR lists the Water Forum proposal's final EIR as one of the technical analyses upon which it is based but, again, does not expressly incorporate any part of that document by reference or state that it is formally tiered from the earlier environmental impact analysis. Because it does not expressly tier from or incorporate the earlier documents, a reader of the FEIR would not be alerted that in order to apprehend the intended surface water supply for the Sunrise Douglas project, and particularly the impacts of exploiting that supply, he or she must separately read parts of those earlier documents. And the reader who did look to the earlier documents would do so without explicit reference in the FEIR to the particular portions incorporated. When an EIR uses tiering or incorporation, it must give the reader a better road map to the information it intends to convey. (See CEQA Guidelines, Cal. Code Regs., tit. 14, §§ 15150, subd. (c) [when an EIR incorporates an earlier environmental document by reference, "the incorporated part of the referenced document shall be briefly summarized where possible" and "[t]he relationship between the incorporated part of the referenced document and the EIR shall be described"], 15152, subd. (g) [when tiering is used, "[t]he later EIR or negative declaration should state that the lead agency is using the tiering concept and that it is being tiered with the earlier EIR"].)

The audience to whom an EIR must communicate is not the reviewing court but the public and the government officials deciding on the project. That a party's briefs to the court may explain or supplement matters that are obscure or incomplete in the EIR, for example, is irrelevant, because the public and decision makers did not have the briefs available at the time the project was reviewed and approved. The question is therefore not whether the project's significant environmental effects *can* be clearly explained, but whether they *were*. The Sunrise Douglas FEIR fails that test.

---

[13] At oral argument, plaintiffs' counsel asserted the Water Forum proposal could not be relied upon because, inter alia, it was formulated before discovery of widespread groundwater contamination in the zone 40 area. In using tiering, of course, an agency must consider "whether, in light of changing circumstances, the EIR prepared earlier in the process would still provide an adequate description of the broad effects considered at that stage." (CEQA Guidelines, Cal. Code Regs., tit. 14, § 15152 [Discussion].) We do not attempt to resolve the factual question whether the Water Forum proposal's conjunctive use assumptions need to be reevaluated in light of groundwater contamination discovered in the interim. That should be decided in the first instance by Rancho Cordova in proceedings on remand.

Because the FEIR failed to explicitly incorporate the impacts and mitigation discussion in the Water Forum proposal's final EIR, it lacks, contrary to CEQA's requirements, enforceable mitigation measures for the surface water diversions intended to serve the Sunrise Douglas project. "A public agency shall provide that measures to mitigate or avoid significant effects on the environment are fully enforceable through permit conditions, agreements, or other measures. Conditions of project approval may be set forth in referenced documents which address required mitigation measures or, in the case of the adoption of a plan, policy, regulation, or other public project, by incorporating the mitigation measures into the plan, policy, regulation, or project design." (§ 21081.6, subd. (b); see also CEQA Guidelines, Cal. Code Regs., tit. 14, § 15126.4, subd. (a)(2).) The County could have complied with this command by incorporating the Water Forum proposal final EIR's mitigation measures into the Community and Specific Plans. But absent such incorporation, the FEIR, and the County's findings based on it, are inadequate to support project approval under CEQA because they do not discuss the impacts of new surface water diversions, enforceable measures to mitigate those impacts, or the remaining unmitigated impacts. (See § 21081.)[14] In this respect, the County failed to proceed in the manner required by CEQA.

Real parties also assert that the FEIR's mitigation measure WS-1, which states that entitlements for development within the Sunrise Douglas project shall not be granted without firm proof of available water supplies, assures that water will be available for later phases of the project. As discussed earlier, however, an EIR may not substitute a provision precluding further development for identification and analysis of the project's intended and likely water sources. "While it might be argued that not building a portion of the project is the ultimate mitigation, it must be borne in mind that the EIR must address the project and assumes the project will be built." (*Stanislaus Natural Heritage, supra,* 48 Cal.App.4th at p. 206.) A provision like WS-1 could serve to *supplement* an EIR's discussion of the impacts of exploiting the intended water sources; in that case, however, the EIR, in order adequately to inform decision makers and the public, would then need to discuss the probability that the intended water sources for later phases of development will not eventuate, the environmental impacts of curtailing the project before completion, and mitigation measures planned to minimize any such significant impacts. The Sunrise Douglas FEIR did not attempt such an analysis. In this respect as well, the County erred procedurally.

In short, the FEIR's long-term water supply discussion suffers from both lack of substantial evidence to support its key factual conclusion and legally

---

[14] To the extent mitigation of the impacts of new surface water diversions under the Water Forum agreement is the responsibility of agencies other than the County, approval of the project would require the finding set out in section 21081, subdivision (a)(2).

defective procedures. On the factual question of how future surface water supplies will serve this project as well as other projected demand in the area, the project FEIR presents a jumble of seemingly inconsistent figures for future total area demand and surface water supply, with no plainly stated, coherent analysis of how the supply is to meet the demand. The reader attempting to understand the County's plan for providing water to the entire Sunrise Douglas development is left to rely on inference and speculation. In this respect, the FEIR water supply discussion fails to disclose "the 'analytic route the . . . agency traveled from evidence to action' " and is thus not "sufficient to allow informed decision making." (*Laurel Heights I, supra*, 47 Cal.3d at p. 404.)

The concurring and dissenting opinion purports to find our holding—that the FEIR's long-term water supply discussion is legally insufficient, while the short-term discussion is adequate—"surprising" and the distinctions on which it rests "elusive." (Conc. & dis. opn. of Baxter, J., *post*, at pp. 451, 452.) For maximum clarity, we summarize the pertinent distinctions here.

(1) The time periods involved: According to the FEIR, the first phase of groundwater supply is to occur within about 18 months of project approval, with the second phase following as needed. In contrast, real parties suggest full build-out of the Community Plan may take 15 to 20 years. As the planning horizon is extended, one's confidence that large quantities of new surface water will be available, and not allocated to competing projects that may be developed in the future, necessarily decreases.

(2) Discussion of facilities and competing uses: As already discussed (see *ante*, at pp. 436–437), the administrative record contains information on the potential competitors for Well Field water that, taken together with information on the planned development of the facilities for delivering the water to Sunrise Douglas, is sufficient to demonstrate a likelihood of its availability for Sunrise Douglas. In contrast, the record contains *no* information (beyond the County's general plan projections) on other planned long-term developments in zone 40. Nor does the FEIR disclose any concrete plans for new surface water diversion, treatment and transmission facilities that would tend to tie the new water particularly to Sunrise Douglas. A reader of the FEIR is not informed what other zone 40 development projects are in prospect over the long term, what their specific water needs will be, or when they will draw on available supplies.[15] In these circumstances, the FEIR could not demonstrate a likelihood of adequate long-term supply for Sunrise Douglas without

[15] The concurring and dissenting opinion's assertion that no other projects in zone 40 have been "entitled, approved, or even proposed" (conc. & dis. opn. of Baxter, J., *post*, at p. 452) is thus without factual basis in the FEIR. In effect, the concurring and dissenting opinion simply *assumes* that Sunrise Douglas will be first in line for sufficient new surface water supplies when those supplies are developed, which could be 10, 15 or more years in the future. Such

showing that plans for the zone 40 area call for at least a rough balance between water supply and demand, a showing the FEIR fails to make.

(3) Analysis of impacts and mitigation measures: The FEIR analyzes the impacts of withdrawing groundwater from the Well Field to meet the project's water needs in the near term and proposes mitigation measures, which the County adopted in approving the project. As already discussed, however, the FEIR contains no discussion of the impacts of new surface water diversion or the measures needed to mitigate those impacts and does not adequately incorporate the impact and mitigation discussion contained in the Water Forum proposal's final EIR. (See *ante*, at pp. 442–444.) The FEIR neither states that it is tiered from that earlier EIR, nor expressly incorporates the pertinent discussion from it, nor guides the reader with a summary of the contents of the earlier discussion or a specific reference to the discussion's location within the earlier document, nor incorporates mitigation measures proposed in the earlier EIR into proposed measures the County could adopt as enforceable requirements for implementing the Community and Specific Plans.

The concurring and dissenting opinion also asserts that our decision here will hold Sunrise Douglas and other developments "hostage to a balancing of supply and demand for all conceivable development that is not prohibited by the County's general plan." (Conc. & dis. opn. of Baxter, J., *post*, at p. 452.) This claim misses the mark for two reasons, both of which we have already explained. First, CEQA does not necessarily require that an EIR show that total water supply and demand are or will be in balance in an area. The EIR may by other means demonstrate a reasonable likelihood that water will be available for the project from an identified source (see *ante*, at p. 437 [near-term water supply discussion for this project]) and, even without a showing that water from the identified source is likely to be sufficient, an EIR may satisfy CEQA by fully disclosing the uncertainty, the other possible outcomes, their impacts and appropriate mitigation measures. (See *ante*, at p. 434.)[16] Second, long-term local water planning is not a burden that must be taken up anew, for CEQA purposes, each time a development is proposed; rather, cities and counties may rely on existing urban water management plans, so long as the expected new demand of the development was included

---

assumptions are no more reliable, and no more legally supportable, than the assumption that a water district would in the future, contrary to historical experience, receive 100 percent of its State Water Project allocation. (See *Santa Clarita, supra*, 106 Cal.App.4th at p. 722.)

[16] As we do not hold that CEQA requires planning for a development project to necessarily establish a future area-wide balance between water supply and demand, the concurring and dissenting opinion's claim that our holding mandates what the Legislature deliberately omitted from Water Code section 10911 (see conc. & dis. opn. of Baxter, J., *post*, at pp. 453–454) is unfounded.

in the water management plan's future demand accounting. (See *ante*, at pp. 434–435; Wat. Code, § 10910, subd. (c)(2); Pub. Resources Code, § 21151.9.)

In summary, the FEIR's long-term water supply discussion suffers from both procedural and factual flaws. Procedurally, the FEIR improperly purports to tier from a *future* environmental document, the pending zone 40 master plan analysis. The FEIR also fails to properly incorporate or tier from the impact and mitigation discussion of the Water Forum proposal and hence to include in the present project enforceable mitigation measures for the large new surface water diversions proposed. Finally, it relies on a provision for curtailing later stages of development if water supplies do not materialize without disclosing, or proposing mitigation for, the environmental effects of such truncation. Factually, the FEIR's use of inconsistent supply and demand figures, and its failure to explain how those figures match up, results in a lack of substantial evidence that new surface water diversions are likely to supply the project's long-term needs. We think that with approval at stake of a development project ultimately expected to use more than 22,000 afa of water—almost 4 percent of the entire County's projected urban demand in the year 2030—CEQA entitles the decision makers and the public to a legally proper procedure and to a clearer, more coherent and consistent explanation of how, given the competing demands expected to arise for new water supplies, water is to be provided to the project.

II. *Recirculation of the Draft EIR for Comment on the Cosumnes River Salmon Impacts*

Section 21092.1 provides that when a lead agency adds "significant new information" to an EIR after completion of consultation with other agencies and the public (see §§ 21104, 21153) but before certifying the EIR, the lead agency must pursue an additional round of consultation. In *Laurel Heights II*, *supra*, 6 Cal.4th at page 1129, we held that new information is "significant," within the meaning of section 21092.1, only if as a result of the additional information "the EIR is changed in a way that deprives the public of a meaningful opportunity to comment upon a *substantial* adverse environmental effect of the project or a feasible way to mitigate or avoid such an effect." (Accord, CEQA Guidelines, Cal. Code Regs., tit. 14, § 15088.5, subd. (a).) Recirculation is not mandated under section 21092.1 when the new information merely clarifies or amplifies the previously circulated draft EIR, but is required when it reveals, for example, a new substantial impact or a substantially increased impact on the environment. (*Laurel Heights II*, at pp. 1129–1130.) We further held the lead agency's determination that a newly disclosed impact is not "significant" so as to warrant recirculation is reviewed only for support by substantial evidence. (*Id.* at p. 1135.)

In this case, the draft EIR contained no discussion of the impact the planned groundwater extraction at the Well Field would have on water flows and habitats in the Cosumnes River. When several agencies and private organizations commenting on the draft EIR raised concerns regarding such effects and the resulting impacts on salmon migration, County staff responded in the FEIR that, due to restrictions on the amount of water to be pumped from the Well Field and the limited hydrological connections between the Cosumnes River and the aquifer from which water would be taken, the impact on Cosumnes River flows would be small and insignificant. The County adopted that conclusion in its findings approving the project.

Plaintiffs contend, and we agree, that the County's finding is not supported by substantial evidence because the FEIR discloses a potentially significant impact of reduced river flows on aquatic species, including migrating salmon.[17] While concluding the effect of further groundwater withdrawals was likely to be small and therefore generally insignificant, the FEIR authors included this proviso: "The potential exception could be during periods of very low flow. During such periods of low flow, these depletions could change the timing and areal extent of the dewatering of the stream invert, potentially impacting aquatic and riparian-dependent species and habitat."

Though phrased as a limited exception to the conclusion of insignificance, this reservation appears instead to identify a substantial, or at least potentially substantial, new impact. That is because "periods of very low flow" are precisely those in which, according to comments on the draft EIR by the United States Fish and Wildlife Service and the Nature Conservancy, migratory fish, waiting in the fall for streamflows to rise to sufficient levels, are likely to be adversely affected by further dewatering. The potential adverse change identified by the FEIR in "the timing and areal extent of the [Cosumnes's] dewatering" is impossible to distinguish from the barrier to migration caused, according to the Nature Conservancy's comment, when the Cosumnes River "ceases flowing earlier in the year, stays dry longer into the Fall, and dries over an increasingly long reach . . . ."

Moreover, the area of the Cosumnes River in which the FEIR projects potential loss of flow overlaps with the river's migratory reach. The Fish and Wildlife Service comment identifies the migratory reach as "from the tidal zone to LaTrobe Rd.," a reach that includes both of the areas identified by the

---

[17] Under section 21068, a significant environmental impact is defined as "a substantial, or *potentially substantial,* adverse change in the environment." (Italics added.) In *Laurel Heights II, supra,* 6 Cal.4th at page 1131, we explained that recirculation had been required in an earlier case because the draft EIR had not addressed a *"potentially substantial* adverse environmental effect." (Italics added.)

FEIR as having a hydrological connection to the lower aquifer ("to the east of Dillard Road and to the west of Twin Cities Road").[18]

Thus, in response to comments raising the issue of an impact on salmon migration in the Cosumnes River, the FEIR states, in effect, that loss of flow to that river is likely to be small and therefore insignificant *except that* the river might remain drier longer in the year—including when the salmon would be migrating—and over a longer reach—including where the salmon would be migrating. We do not consider this response substantial evidence that the loss of stream flows would have no substantial effect on salmon migration. Especially given the sensitivity and listed status of the resident salmon species, the County's failure to address loss of Cosumnes River stream flows in the draft EIR " 'deprived the public . . . of meaningful participation' " (*Laurel Heights II, supra,* 6 Cal.4th at p. 1131) in the CEQA discussion. (See CEQA Guidelines, Cal. Code Regs., tit. 14, § 15065, subd. (a)(1) [potential substantial impact on endangered, rare or threatened species is per se significant].)

Real parties and Rancho Cordova point out that the FEIR "contemplated additional environmental review of the Cosumnes River issue in the then-pending" zone 40 master plan EIR. But as we explained in part I. above, analysis of the project's impacts could not be deferred in this manner. An EIR cannot be tiered from another EIR if the latter is not yet complete.

The burden of recirculating a draft EIR, we note, may be limited by the scope of the revisions required. "If the revision is limited to a few chapters or portions of the [draft] EIR, the lead agency need only recirculate the chapters or portions that have been modified." (CEQA Guidelines, Cal. Code Regs., tit. 14, § 15088.5, subd. (c).)

### CONCLUSION

The preparation and circulation of an EIR is more than a set of technical hurdles for agencies and developers to overcome. The EIR's function is to ensure that government officials who decide to build or approve a project do so with a full understanding of the environmental consequences and, equally important, that the public is assured those consequences have been taken into account. (*Laurel Heights I, supra,* 47 Cal.3d at pp. 391–392.) For the EIR to serve these goals it must present information in such a manner that the foreseeable impacts of pursuing the project can actually be understood and weighed, and the public must be given an adequate opportunity to comment

---

[18] As plaintiffs point out, LaTrobe Road crosses the Cosumnes River upstream (east) of the river's crossing with Dillard Road. We may take notice of this fact under Evidence Code sections 452 and 459. (See Thomas Guide to Sacramento County (2001) pp. 6–7.)

on that presentation before the decision to go forward is made. On the important issues of long-term water supply and impacts on migratory fish, the County's actions in the present case fell short of these standards.

DISPOSITION

The judgment of the Court of Appeal is reversed, and the matter is remanded to that court for further proceedings consistent with this opinion.

George, C. J., Kennard, J., Chin, J., Moreno, J., and Corrigan, J., concurred.

**BAXTER, J.,** Concurring and Dissenting.—I concur in the majority's conclusion that the final environmental impact report (FEIR) for the Sunrise Douglas project adequately assessed the near-term environmental impacts of supplying water to the proposed development. This conclusion rests in large part on the majority's finding of a reasonable likelihood that groundwater from the North Vineyard Well Field (Well Field) would be available to supply the project's near-term needs. I agree in particular that substantial evidence supports the FEIR's reliance on the Well Field even though Well Field water had not been reserved " 'for any specific user' " and would be made available " 'on a "first-come, first served" basis' " (maj. opn., *ante*, at p. 436), even though existing demand and new demand in the region "might also be satisfied from the Well Field" (*ibid.*), even though serving that demand and the initial phase of the Sunrise Douglas project "would require much more water than . . . [the Well Field] can safely provide" (*ibid.*), and even though "much uncertainty remains" as to the Well Field's ability to supply water to the project in the near term (*id.* at p. 437). As the majority explains, nothing in the administrative record demonstrates "that these competing demands can be satisfied *only* from the Well Field or that they will all materialize in full in the near term and have priority over the Sunrise Douglas project." (*Id.* at p. 436.) Indeed, as the majority subsequently explains, there is more than enough water that can be drawn from the Well Field to satisfy this project's near-term demand even after one subtracts the expected demand for *"already entitled* development." (*Id.* at p. 437, italics added.)

Like the majority, I further agree that the FEIR need not provide "firm assurances" of long-term water supplies at the early stages of the land use planning and approval process, inasmuch as the "ultimate question" under the California Environmental Quality Act (Pub. Resources Code, § 21000 et seq.; CEQA) "is not whether an EIR establishes a likely source of water, but whether it adequately addresses the reasonably foreseeable *impacts* of supplying water to the project." (Maj. opn., *ante*, at p. 434.) The requisite level of specificity in identifying water supplies thus increases " 'at each step as land

use planning and water supply planning move forward from general phases to more specific phases.' " (*Id.* at p. 434.) For example, because the SunRidge Specific Plan is further along the planning process than is the Sunrise Douglas Community Plan (*id.* at pp. 437–438), CEQA imposes a greater level of specificity in identifying water supplies for the specific plan than it does for the community plan. What is sufficiently specific for the specific plan in the near term should therefore prove more than sufficient for the community plan in the long term, inasmuch as "CEQA should not be understood to require assurances of certainty regarding long-term future water supplies at an early phase of planning for large land development projects." (*Id.* at p. 432.)

The surprising thing, though, is that the majority has adopted precisely the *opposite* rule in analyzing the sufficiency of the FEIR for this project in the long term. The FEIR estimates the average water demand of the entire Sunrise Douglas Community Plan at full build-out will be 22,103 acre-feet annually (afa). The sources identified in the record to meet this demand are more than ample: at least 5,500 afa from the Well Field, with a possibility of up to 10,000 afa; 15,000 afa of American River water under the Sacramento County Water Agency's existing contract with the federal Bureau of Reclamation (an allocation known as Fazio water); 15,000 afa of American River water under the water agency's agreement in principle with the Sacramento Municipal Utility District (SMUD); an additional 15,000 afa as to which the water agency and SMUD are in negotiations; and 33,000 afa of intermittent water consisting of excess flows on the American and Sacramento Rivers for which the water agency is applying. In other words, the FEIR has identified sufficient water for this project *three or four times over*.

Why the majority nonetheless holds that the FEIR has insufficiently identified long-term water supplies for Sunrise Douglas—and, in doing so, reverses both the trial court and the Court of Appeal—is thus difficult to comprehend. There does not appear to be a problem with the likelihood that the identified water supplies will come to fruition. Although these supplies "are not *certain* to materialize," the majority correctly points out that "CEQA does not require this level of certainty at planning stages prior to approval of permits, subdivision maps or other development entitlements." (Maj. opn., *ante,* at p. 438.) There also does not appear to be a problem with the analysis of the reasonably foreseeable impacts of supplying water to the project in the long term, inasmuch as the FEIR for the Water Forum proposal "extensively analyzed the environmental impacts of the participants' planned increases in surface water diversion"—indeed, a *summary* of these impacts and the proposed mitigation measures occupies 85 pages of that FEIR—and the FEIR for this project analyzed "[t]he impacts of groundwater withdrawals at the Well Field." (Maj. opn., *ante,* at pp. 423, 424.)

The majority's rejection of the Sunrise Douglas FEIR rests instead on the FEIR's failure to balance total long-term water supply and demand in the entirety of the Sacramento County Water Agency's zone 40, an area comprising the southern and eastern regions of the county that is almost *10 times* as large as the Sunrise Douglas project. The majority simply asserts, without explanation, that while substantial evidence "support[s] the conclusion that *some part* of the planned new surface water supplies will be developed and made available to the Water Agency for use in its zone 40" (maj. opn., *ante*, at p. 438), there is "too great a degree of uncertainty regarding the long-term availability of water *for this project.*" (*Id.* at p. 439, italics added.) The distinction is an elusive one. The Fazio water for the long term, like the Well Field water in the short term, will be made available to users on a first-come, first-served basis, and, as with the Well Field water, there is no indication in the record that capacity for these long-term supplies has been " 'reserved . . . for any specific user,' " that these other "competing demands" can be satisfied *only* from the identified supplies, or that the potential demand from other sources will all "materialize in full" in the relevant period *and* "have priority over the Sunrise Douglas project." (*Id.* at p. 436.) The only significant distinction I can see is that, in contrast to its discussion of the Well Field water, the majority does not identify *any* portion of the project's long-term supplies that has been "already allocated to other entitled uses." (*Id.* at p. 437.) But that distinction, of course, would *favor* the FEIR's analysis of the project's long-term supplies. Thus, if the majority's analysis of the two situations had been consistent, the majority should have found substantial evidence that these long-term supplies will be available at least in substantial part to supply the Sunrise Douglas project. The majority finds otherwise only by *assuming* that other users will have priority on all of the identified supplies—or, to put it another way, by *speculating* that there is evidence outside the record that would rebut the county board of supervisors' finding, sustained by both the trial court and the Court of Appeal below, that the supplies will be adequate. (See maj. opn., *ante*, at pp. 445–446, fn. 15.)

The path the majority pursues to reverse the lower court judgments is a curious one. What dooms the FEIR here, according to the majority, is the potential for increased long-term demand from other, purely hypothetical projects that *could* be developed under the 1993 general plan for the zone 40 area—even if, so far as the record discloses, those projects have not yet been entitled, approved, or even proposed. In other words, Sunrise Douglas must be held hostage to a balancing of supply and demand for all conceivable development that is not prohibited by the county's general plan—even if no one has yet stepped forward to propose such development.

Until today, this was not the law in California.[1] The majority can find no support for its new rule in the statute for, as the majority concedes (maj. opn., *ante*, at p. 428), neither CEQA itself nor this court's decisions have ever before required a project environmental impact report (EIR) not only to demonstrate a reasonable likelihood that there is water for the project at issue but also that there is water for all hypothetical future projects nearby, including those no entity has yet planned to build. Thus, as the majority elsewhere observes, "Decision makers must, under the law, be presented with sufficient facts to 'evaluate the pros and cons of supplying the amount of water that the [project] will need.' " (Maj. opn., *ante*, at p. 431, quoting *Santiago County Water Dist. v. County of Orange* (1981) 118 Cal.App.3d 818, 829 [173 Cal.Rptr. 602].) An EIR "must analyze, to the extent reasonably possible, the impacts of providing water to the entire proposed project." (Maj. opn., *ante*, at p. 431.) An EIR, in particular, need not analyze a " 'worst case scenario' " and "need not identify and analyze all possible resources that might serve the Project should the anticipated resources fail to materialize." (*Napa Citizens for Honest Government v. Napa County Bd. of Supervisors* (2001) 91 Cal.App.4th 342, 373 [110 Cal.Rptr.2d 579].) None of these cases requires an EIR to identify a water supply sufficient to meet the demands of all development envisioned by the project, *together with all hypothetical future development that might look to the same supplies.*

The majority suggests that a balancing of total supply and demand in the zone 40 region is required by the CEQA Guidelines (Cal. Code Regs., tit. 14, § 15000 et seq.) in order to evaluate the long-term cumulative impact of development on water supply. (Maj. opn., *ante*, at p. 441, citing CEQA Guidelines, Cal. Code Regs., tit. 14, § 15130, subd. (b)(1)(B).) But a "cumulative impact" consists of "the change in the environment which results from the incremental impact of the project when added to other closely related past, present, and *reasonably foreseeable probable future projects*" (CEQA Guidelines, tit. 14, § 15355, subd. (b), italics added), not (as the majority apparently assumes) all *possible* future projects. Under the majority's newly minted rule, *no* project could ever be approved in the zone 40 area until the entire region's projected long-term water supply and demand are in balance.

This is essentially the rule that the Legislature considered—and *rejected*—in amending the Water Code in 1995. The initial versions of Senate Bill No. 901 (1995–1996 Reg. Sess.), which (among other things) added sections 10910 to 10915 to the Water Code, directed the lead agency for a

---

[1] It also, quite obviously, is not the test by which the majority has approved the adequacy of the FEIR's analysis of water supplies in the near term. The majority finds that analysis adequate, notwithstanding the fact that supplying existing and new demand in the area as well as a significant portion of the Sunrise Douglas project from the Well Field in the near term "would require much more water than the 10,000 afa that source can safely provide." (Maj. opn., *ante*, at p. 436.)

project EIR to request a water supply and demand assessment from the appropriate public water system, and stated that the lead agency "shall consider a project to have a significant effect on the environment" if, based on that assessment, "water supplies are, or will be, insufficient to meet the reasonable needs of the proposed project in addition to existing and planned future uses." (Sen. Bill No. 901 (1995–1996 Reg. Sess.) § 2, as amended July 5, 1995, italics omitted, proposed Wat. Code, § 10915.) The bill as enacted, however, deleted the requirement that the lead agency make a finding of a significant environmental impact under such circumstances and directed the lead agency, if it determined that water supplies will not be sufficient to meet existing and planned future uses, instead simply to "include that determination in its findings."[2] (Sen. Bill No. 901 (1995–1996 Reg. Sess.) § 4, as amended Sept. 7, 1995, italics omitted; Stats. 1995, ch. 881, § 4, p. 6705, adding Wat. Code, § 10911.) This sequence of events makes me confident that the Legislature did not intend to require a project EIR to balance water supply with water demand not only for the project itself but also for the entire region. (Cf. *Hess v. Ford Motor Co.* (2002) 27 Cal.4th 516, 532 [117 Cal.Rptr.2d 220, 41 P.3d 46] [" 'Generally the Legislature's rejection of a specific provision which appeared in the original version of an act supports the conclusion that the act should not be construed to include the omitted provision' "]; accord, *INS v. Cardoza-Fonseca* (1987) 480 U.S. 421, 442–443 [94 L.Ed.2d 434, 107 S.Ct. 1207] [" 'Few principles of statutory construction are more compelling than the proposition that Congress does not intend *sub silentio* to enact statutory language that it has earlier discarded in favor of other language' "].) The majority offers no justification for effectively reinserting what the Legislature has rejected.

Indeed, the legislative history leading to the elimination of the Senate Bill No. 901 (1995–1996 Reg. Sess.) stricter requirement explains why this court ought not itself resurrect it. One legislative analysis warned that the required finding of a significant environmental impact due to an imbalance between water supply and demand on a regional basis "could be a severe roadblock to housing development as it is the [Department of Housing and Community Development]'s experience that many areas of the State cannot demonstrate water supply availability for all potential development which could be permitted under their general plan land use designations within the next five years. Also, it would be infeasible for many cities or counties to demonstrate water supply availability for all potential development over the 10 to 20 year timeframes of general plan updates." (Dept. of Housing and Community Development, analysis of Sen. Bill No. 901 (1995–1996 Reg. Sess.) Aug. 7, 1995, p. 5.) The Department of Housing and Community Development's analysis further warned that "[w]here there may be an adequate water supply

---

[2] As the majority concedes, the county's compliance with these Water Code provisions is not at issue in this case. (Maj. opn., *ante*, at p. 433, fn. 8.)

for a housing project and the project may have no significant effect on the environment, but an inadequate water supply exists for long term future uses, mitigation measures in the form of fees are likely to be assessed to buy water or develop new supplies. These are likely to significantly increase costs for new housing development." (*Id.* at p. 6.) Moreover, "[u]sing the complex and bureaucratic CEQA process to assure local water planning is likely to result in significant administrative costs which will, in every likelihood, be charged to new development because there is no other pocket to pay." (*Id.* at p. 8.) Finally, such an approach would supply "new opportunities for court challenges of new housing and job-creating development. From the perspective of possible environmental litigation, the bill would create great uncertainty." (*Id.* at p. 7.)[3]

I also find it interesting that neither plaintiffs nor the Attorney General as amicus curiae, when offered the opportunity at oral argument to embrace the majority's new rule, chose to do so. Plaintiffs stated instead that "the EIR must address the water supply essential for the scope of the project that is approved," not for the entire general plan. The Attorney General similarly explained that the general rule under CEQA is that an agency must consider "all the significant environmental impacts for the project that it is approving," distinguishing the SunRidge Specific Plan and Sunrise Douglas Community Plan from the entire zone 40 area, and that considering the entire general plan was thus "too far out from where this court needs to go."

By recognizing that CEQA does not require a project EIR to balance water supply and demand on a regional basis, I do not intend to diminish the significance of a finding in a project FEIR that projected supply will not be able to satisfy the entirety of projected demand contemplated by a general plan. Obviously, if new supplies are not found, then a decision to approve one project means that projects proposed later in time may be unable to identify adequate water supplies and therefore may not be built. If not all of the development contemplated by the general plan can be built, cities and counties must ensure that the projects that *are* approved are of the highest priority, in order to prevent the negative economic or social effects from haphazard development. However, one must also remember that "[e]conomic or social effects of a project shall not be treated as significant effects on the environment" (CEQA Guidelines, tit. 14, § 15131, subd. (a)) and therefore are beyond the scope of CEQA. Under the majority's new rule, however, once a city or county approves a general plan, it could not approve a project in

---

[3] The Governor's Office of Planning and Research also cautioned that an early version of the bill made no provision for measures that may act to reduce overall demand by requiring "new development to retrofit old, existing development in order to free sufficient 'wasted' water to serve the new project." (Governor's Off. of Planning and Research, analysis of Sen. Bill No. 901 (1995–1996 Reg. Sess.) Apr. 3, 1995, p. 6.)

furtherance of that plan unless or until it had secured water sources for build-out of the entire general plan. Nothing in CEQA requires such a result. (*Atherton v. Board of Supervisors* (1983) 146 Cal.App.3d 346, 351 [194 Cal.Rptr. 203] [" 'where future development is unspecified and uncertain, no purpose can be served by requiring an EIR to engage in sheer speculation as to future environmental consequences' "].)

It is no answer to suggest, as the majority does, that the FEIR for the Sunrise Douglas Community Plan might have been adequate if it instead had disclosed "concrete plans for new surface water diversion, treatment and transmission facilities that would tend to tie the new water particularly to Sunrise Douglas," akin to those included in the SunRidge Specific Plan's discussion of water from the Well Field. (Maj. opn., *ante*, p. 445.) The majority seems to forget that "[t]o interpret CEQA itself as requiring such firm assurances of future water supplies at relatively early stages of the land use planning and approval process would put CEQA in tension with . . . more specific water planning statutes." (Maj. opn., *ante*, at p. 434.) Indeed, it is precisely *because* "full build-out of the Community Plan may take 15 or 20 years" (*id.* at p. 445) that the analysis of water supplies for the Community Plan did not need to be as detailed as the analysis for water supplies for the Specific Plan, which would begin to draw water "within about 18 months of project approval." (*Id.* at p. 445.) The majority's insistence that the analysis of zone 40 water supplies in the long-term must be as concrete as that for the Well Field in the near-term completely inverts its earlier assertion that " 'water supplies must be identified with more specificity at each step as land use planning and water supply planning move forward from general phases to more specific phases.' " (*Id.* at pp. 433–434.)

The reader might likewise be forgiven for looking with skepticism at the majority's assurance that "CEQA does not necessarily require that an EIR show that total water supply and demand are or will be in balance in an area," inasmuch as the majority elsewhere condemns *this* FEIR because it "could not demonstrate a likelihood of adequate long-term supply for Sunrise Douglas without showing that plans for the Zone 40 area call for at least a rough balance between water supply and demand, a showing the FEIR fails to make." (Compare maj. opn., *ante*, at p. 445 with *id.* at p. 446.) And if, as the majority belatedly states, it would be enough for the FEIR, as to future water supplies needed for the project, to "include only the public water system's plans for acquiring the additional supplies, including cost and time estimates and regulatory approvals the system anticipates needing" (maj. opn., *ante*, at p. 433; see *id.* at pp. 446–447), one wonders why the majority goes on at length to discuss far more burdensome requirements—and what authority it has to do so.

In sum, the majority's insistence that the FEIR should have identified sufficient water not merely for the project itself but also for all conceivable future development in the region suffers from a number of serious defects. It is not supported by any statute or guideline—or, indeed, by any party to this litigation. It is inconsistent with the legislative history of Water Code section 10911. It is inconsistent as well with the majority's own analysis of the environmental effects of drawing on this project's near-term water supplies. And, as the Legislature recognized in rejecting such an approach in 1995, it will discourage new housing development, increase its cost, create uncertainty, and trigger more litigation. For all these reasons, I respectfully dissent.

Appellants' petition for a rehearing was denied April 18, 2007, and the opinion was modified to read as printed above. George, C. J., did not participate therein. Baxter, J., was of the opinion that the petition should be granted.