Filed 1/14/26

CERTIFIED FOR PUBLICATION

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

THIRD APPELLATE DISTRICT

(Sacramento)

----

| | |
|---|---|
| CITY OF VALLEJO, | C102070 |
| Plaintiff and Appellant, | (Super. Ct. No. 23WM000055) |
| v. | |
| CITY OF AMERICAN CANYON, | |
| Defendant and Respondent; | |
| BUZZ OATES LLC et al., | |
| Real Parties in Interest and Respondents. | |

        APPEAL from a judgment of the Superior Court of Sacramento County, Stephen P. Acquisto, Judge.  Affirmed.

        White Brenner, Barbara A. Brenner, Angela Schrimp de la Vergne, Kerry A. Fuller, and J. Gage Marchini for Plaintiff and Appellant.

        Law Offices of William D. Ross, William D. Ross, Christina M. Bellardo, David P. Schwarz; Somach Simmons & Dunn, Alexis K. Stevens, Michelle E. Chester, Kelley M. Taber, and Casey A. Shorrock for Defendant and Respondent.

1

Remy Moose Manley, James G. Moose, and Christina L. Berglund for Real Parties in Interest and Respondents.

The City of American Canyon (American Canyon) certified an environmental impact report (EIR) for the Giovannioni Logistics Center Project (the Project), an industrial warehouse complex to be located on undeveloped land within city limits. The City of Vallejo (Vallejo), American Canyon's neighbor to the north, filed a petition for writ of mandate under the California Environmental Quality Act (CEQA) (Pub. Resources Code, § 21000 et seq.), challenging American Canyon's certification of the EIR and approval of the Project.[1] The trial court denied the petition and entered judgment in favor of American Canyon and the Project's developer, real party in interest Buzz Oates LLC (Buzz Oates). Vallejo appeals, arguing the EIR fails to comply with water supply disclosures required by CEQA and the CEQA Guidelines (Cal. Code Regs., tit. 14, § 15000 et seq.) (Guidelines). Vallejo also argues the EIR fails to comply with Water Code sections 10910 and 10911. We disagree and affirm.

## I. BACKGROUND

American Canyon does not currently have access to groundwater and so relies on outside sources for water. Most of American Canyon's water—around 5,200 acre-feet per year—comes from the California State Water Project (State Water Project).[2] Much of

[1] Undesignated statutory references are to the Public Resources Code.

[2] The State Water Project is "one of the largest water projects in the world, consisting of dams, reservoirs, storage tanks, pumping plants, aqueducts, pipelines, and canals designed to capture, store, and deliver water throughout the state. Each year, the [State Water Project] delivers water to about 25 million residents from Napa Valley to San Diego and irrigates about 750,000 acres of farmland." (*Central Delta Water Agency v. Department of Water Resources* (2021) 69 Cal.App.5th 170, 182; see also *Planning & Conservation League v. Department of Water Resources* (2024) 98 Cal.App.5th 726, 741-

2

the rest—approximately 23 percent of American Canyon's water supply in a "normal" year—comes from Vallejo.

*A.     The 1996 Agreement*

Vallejo, like American Canyon, receives water from the State Water Project. But Vallejo also holds an appropriative water right known as License 7848.[3] American Canyon purchases water from Vallejo pursuant to an agreement entered between the two cities in 1996 and addenda thereto (cumulatively, the 1996 Agreement).

The 1996 Agreement authorizes three types of water purchases: (1) as much as 3,206 acre feet of potable treated water per year (Vallejo treated water); (2) as much as 500 acre-feet of raw water diverted from the Sacramento-Bay Delta pursuant to License 7848 (Vallejo permit water); and (3) as much as 500 acre-feet of emergency raw water in dry years only (Vallejo emergency water).[4]

The 1996 Agreement is the subject of another lawsuit between the parties (the contract litigation), the details of which are not part of our record (Sacramento County case No. 34-2022-00327471). The record reveals only that American Canyon sued

---

744 [describing the regulatory framework governing the State Water Project's delivery of water to local governments].)

"An acre-foot is 43,560 cubic feet. Colloquially, it is an irrigation-based measurement equaling the quantity of water required to cover an acre of land to a depth of one foot." (*Brydon v. East Bay Mun. Utility Dist.* (1994) 24 Cal.App.4th 178, 182, fn. 1.)

[3] Appropriative water rights "allow the rights holder to divert a specified quantity of surface water for a reasonable, beneficial use on land." (See generally *Buena Vista Water Storage Dist. v. Kern Water Bank Authority* (2022) 76 Cal.App.5th 576, 582.)

[4] A word on terminology. Our analysis will sometimes require us to specifically distinguish between the three types of water identified in the text (i.e., Vallejo treated water, Vallejo permit water, and Vallejo emergency water). At other times, however, we will refer more generally to "Vallejo water," by which we mean any water purchased from Vallejo by American Canyon under the 1996 Agreement, of any type. At still other times, we will refer to "License 7848 water," by which we mean water diverted to Vallejo pursuant to its appropriative water right, whether or not sold to American Canyon.

3

Vallejo for declaratory relief and breach of contract in July 2022, seeking a determination of the parties' rights and responsibilities under the 1996 Agreement. Whatever happens in the contract litigation, two things appear certain. First, Vallejo has historically satisfied its obligations to American Canyon with License 7848 water. Second, neither American Canyon nor Vallejo seeks to invalidate the 1996 Agreement. With this background, we now turn to the present dispute.

B.      *The Project*

The Project consists of a 2.4 million square foot warehouse complex to be constructed on undeveloped and industrially zoned land in American Canyon. The warehouse complex will occupy 163 acres of a 208 acre project site, with most of the remainder preserved as wetlands. Once operational, the Project will require 23.9 acre-feet of potable water per year, an amount that could reasonably be characterized as modest compared to other uses.

C.      *The Project Approval Process*

American Canyon issued a notice of preparation of an EIR for the Project in January 2021. A draft EIR was prepared and circulated for public review from May through July 2022. The draft EIR attached a draft water supply assessment prepared by an environmental consulting firm for Buzz Oates.

American Canyon issued the final EIR in two volumes.[5] The first volume was released on October 31, 2022, and included responses to all significant environmental issues raised in timely comments to the draft EIR. The second volume was released on February 7 or 10, 2023, and appears to have been substantively identical to the first. A final water supply assessment was attached as an appendix to the EIR.

---

[5] This was done to address a notice issue, the details of which need not concern us.

4

A public hearing was set for the evening of February 21, 2023.  Vallejo sent an email to American Canyon some 90 minutes beforehand.  The email attached two comment letters.  The first letter was dated February 21, 2023, (the February 2023 letter) and set forth Vallejo's comments concerning the EIR in draft form.  The second letter was dated April 6, 2022, (the April 2022 letter) and contained Vallejo's comments concerning a draft of another planning document, American Canyon's urban water management plan for 2020 (the 2020 plan).[6]

As relevant here, the February 2023 letter argued the EIR's water supply assessment was deficient for three reasons.  First, the February 2023 letter argued the water supply assessment failed to recognize place of use restrictions associated with License 7848, which prevented Vallejo from delivering License 7848 water to certain areas within American Canyon, including the project site.  Second, the February 2023 letter argued the water supply assessment failed to consider the impact of the contract litigation.  Finally, the February 2023 letter argued the water supply assessment failed to consider Vallejo's comments concerning the draft of the 2020 plan, as set forth in the previously submitted April 2022 letter.

As mentioned, the April 2022 letter raised objections to a draft of the 2020 plan.  The April 2022 letter urged American Canyon to make four revisions relevant to the present appeal.  First, the April 2022 letter proposed a revision to clarify that only License 7848 water could be legally supplied to American Canyon.  Second, the April 2022 letter proposed a revision to clarify that License 7848 water is subject to place of

---

[6]  "To achieve the goal of water conservation and efficient use, urban water suppliers are required to develop water management plans that include long-range planning to ensure adequate water supplies to serve existing customers and future demands for water.  [Citation.]  The plans must consider a 20-year time horizon [citation], and must be updated 'at least once every five years.' "  (*Friends of the Santa Clara River v. Castaic Lake Water Agency* (2004) 123 Cal.App.4th 1, 8.)

use restrictions which prevent Vallejo from delivering water to parts of American Canyon. Third, the April 2022 letter took exception to the draft's representation that 3,207 acre feet of water were available to American Canyon under the 1996 Agreement. According to the April 2022 letter, the draft should have been revised to clarify that American Canyon purchased something less than that amount. Finally, the April 2022 letter recommended that American Canyon revise the 2020 plan to clarify that deliveries of License 7848 water had been curtailed in 2015 and were expected to be curtailed again in summer 2022. American Canyon adopted the 2020 plan in January 2023, without making any of the requested revisions or clarifications. Vallejo does not appear to have formally challenged the 2020 plan.

The public hearing for the Project was conducted as planned on February 21, 2023. An assistant city attorney appeared for Vallejo to echo the above-mentioned concerns. American Canyon continued deliberations on the Project to review Vallejo's comment letters and consult with outside counsel. American Canyon's outside counsel prepared a written response to Vallejo's February 2023 letter, opining that the water supply assessment was factually accurate and legally sufficient. American Canyon resumed deliberations on March 21, 2023, and certified the EIR and approved the Project the next day.

D.     *The Petition*

Vallejo filed a verified petition for writ of mandate in Napa County Superior Court on April 21, 2023. The action was consolidated with similar actions by two environmental groups—the Center for Biological Diversity and Golden State Environmental Justice Alliance—and transferred to Sacramento Superior Court. The other actions were resolved by settlement, leaving Vallejo as the only remaining petitioner.

With its petition, Vallejo sought orders compelling American Canyon to set aside certification of the EIR and approval of the Project. The petition asserted four causes of

6

action for violations of CEQA, all based on alleged deficiencies in the EIR's water supply assessment. The petition also asserted a cause of action for violations of Water Code sections 10910 and 10911 based on the same alleged deficiencies.

*E.     Trial Court Proceedings*

The trial court heard argument on the petition on May 28, 2024. The trial court denied the petition in a ruling on submitted matter issued July 12, 2024, and entered judgment in favor of American Canyon and Buzz Oates on September 10, 2024. This appeal timely followed.

## II. DISCUSSION

*A.     CEQA (First through Fourth Causes of Action)*

As mentioned, the petition alleged four causes of action for violations of CEQA based on alleged deficiencies in the EIR's water supply assessment. For the first cause of action, the petition alleged the EIR violated CEQA by failing to disclose the volumes of water American Canyon actually purchased from Vallejo. For the second cause of action, the petition alleged the EIR violated CEQA by failing to disclose place of use restrictions associated with License 7848 water. For the third cause of action, the petition alleged the EIR violated CEQA by failing to disclose the impact of emergency curtailment orders on water supply reliability. For the fourth of action, the petition alleged the EIR violated CEQA by failing to disclose the contract litigation.

Our analysis of Vallejo's CEQA causes of action will proceed in three parts. First, we will provide an overview of CEQA and the applicable standards of review. Second, we will address American Canyon's argument that some or all of Vallejo's CEQA causes of action should be dismissed for failure to exhaust administrative remedies. Third, we will discuss CEQA principles unique to water supply analyses. We will then consider Vallejo's specific challenges to the EIR.

*1.     CEQA Overview and Standard of Review*

"CEQA is a comprehensive scheme designed to provide long-term protection to the environment." (*Mountain Lion Foundation v. Fish & Game Com.* (1997) 16 Cal.4th 105, 112.)  "With narrow exceptions, CEQA requires an EIR whenever a public agency proposes to approve or to carry out a project that may have a significant effect on the environment." (*Laurel Heights Improvement Assn. v. Regents of University of California* (1988) 47 Cal.3d 376, 390 (*Laurel Heights*); see also *Tsakopoulos Investments, LLC v. County of Sacramento* (2023) 95 Cal.App.5th 280, 287 ["[a] project will have a significant effect on the environment if it will cause 'a substantial, or potentially substantial, adverse change in' 'the physical conditions [that] exist within the area [that] will be affected by [the] project, including land, air, water, minerals, flora, fauna, noise [and] objects of historic or aesthetic significance' "].)

The EIR here was also required to comply with certain provisions of the Water Code.  (See § 21151.9; Guidelines, § 15155, subd. (a)(1)(E).)  Water Code sections 10910 to 10912 "require the city or county considering a project to obtain, at the outset of the CEQA process, a water supply 'assessment' from the applicable public water system," which "is then to be included in any CEQA document the city or county prepares for the project." (*Vineyard Area Citizens for Responsible Growth, Inc. v. City of Rancho Cordova* (2007) 40 Cal.4th 412, 433 (*Vineyard*).)  As noted, a water supply assessment was conducted as part of the environmental review process for the Project and attached as an appendix to the EIR.

The EIR is often described as " 'the heart of CEQA.' "  (See, e.g., *Laurel Heights, supra*, 47 Cal.3d at p. 392; see also *Cleveland National Forest Foundation v. San Diego Assn. of Governments* (2017) 3 Cal.5th 497, 511; *In re Bay-Delta* (2008) 43 Cal.4th 1143, 1162.)  An EIR "serves to '(1) inform the government and public about a proposed activity's potential environmental impacts; (2) identify ways to reduce, or avoid, those impacts; (3) require project changes through alternatives or mitigation measures when

8

feasible; and (4) disclose the government's rationale for approving a project.' " (*County of Butte v. Department of Water Resources* (2023) 90 Cal.App.5th 147, 158 (*County of Butte*); see also *Southwest Regional Council of Carpenters v. City of Los Angeles* (2022) 76 Cal.App.5th 1154, 1171 ["An EIR 'is an informational document' designed to 'provide public agencies and the public in general with detailed information about the effect [of] a proposed project . . . on the environment' "].)

"To fulfill these purposes, an 'EIR "must include detail sufficient to enable those who did not participate in its preparation to understand and to consider meaningfully the issues raised by the proposed project." ' " (*County of Butte, supra*, 90 Cal.App.5th at p. 158; *Cleveland National Forest Foundation v. San Diego Assn. of Governments, supra*, 3 Cal.5th at p. 511.) At the same time, "[t]oo much should not be expected of an EIR. It is not to have the exhaustive scope of a scientific textbook. 'An EIR should be prepared with a sufficient degree of analysis to provide decisionmakers with information which enables them to make a decision which intelligently takes account of environmental consequences. An evaluation of the environmental effects of a proposed project need not be exhaustive, but the sufficiency of an EIR is to be reviewed in the light of what is reasonably feasible. . . . The courts have looked not for perfection but for adequacy, completeness, and a good faith effort at full disclosure.' " (*Tiburon Open Space Committee v. County of Marin* (2022) 78 Cal.App.5th 700, 726.)

"On appeal from a judgment in a mandamus proceeding under CEQA, our standard of review is the same as the trial court's: we independently review the administrative record and the lead agency's action, not the trial court's decision and in this sense our review under CEQA is de novo." (*Upland Community First v. City of Upland* (2024) 105 Cal.App.5th 1, 14; see *Vineyard, supra*, 40 Cal.4th at p. 427.) In reviewing whether an agency has complied with CEQA, however, our inquiry extends " 'only to whether there was a prejudicial abuse of discretion.' " (*Vineyard, supra*, at p. 426; see also *Planning & Conservation League v. Department of Water Resources,*

9

*supra*, 98 Cal.App.5th at p. 748.)  An agency may abuse its discretion by failing to proceed in the manner required by law or by reaching factual conclusions unsupported by substantial evidence.  (*Banning Ranch Conservancy v. City of Newport Beach* (2017) 2 Cal.5th 918, 935.)

Judicial review for a claimed failure to proceed in the manner required by law, on the one hand, or for reaching factual conclusions unsupported by substantial evidence, on the other, "differs significantly:  While we determine de novo whether the agency has employed the correct procedures, 'scrupulously enforc[ing] all legislatively mandated CEQA requirements' [citation], we accord greater deference to the agency's substantive factual conclusions." (*Vineyard, supra*, 40 Cal.4th at p. 435.)  " 'This distinction between de novo review and substantial evidence review is often straightforward.  A contention that an agency has, for example, provided an insufficient amount of time for public comment is subject to de novo review.  And a contention that an agency's factual findings are wrong, as a different example, is subject to substantial evidence review.  But questions about the relevant standard of review are not always so clear.' [Citation.]  'This is especially so when the issue is whether an EIR's discussion of environmental impacts is adequate, that is, whether the discussion sufficiently performs the function of facilitating "informed agency decisionmaking and informed public participation." ' [Citation.]  Those types of 'inquir[ies] present[] a mixed question of law and fact' and are 'generally subject to independent review.' [Citations.]  But if 'factual questions predominate, a more deferential standard is warranted.' " (*County of Butte, supra*, 90 Cal.App.5th at p. 159.)

Finally, we presume the EIR was adequate, and the lead agency's decision to certify the EIR was correct.  (*Rialto Citizens for Responsible Growth v. City of Rialto* (2012) 208 Cal.App.4th 899, 924-925; *Sierra Club v. City of Orange* (2008) 163 Cal.App.4th 523, 530.)  The party challenging the EIR—here, Vallejo—bears the burden of proving that the EIR was legally inadequate or insufficient evidence supports its

conclusions, and the failure to comply with CEQA resulted in prejudice, i.e., that the omission of relevant information precluded informed decision making and public participation. (*Rialto, supra*, at p. 925; see also *Bakersfield Citizens for Local Control v. City of Bakersfield* (2004) 124 Cal.App.4th 1184, 1197-1198.)

2.      *Exhaustion of Administrative Remedies*

Before we begin our discussion of the EIR's alleged deficiencies, we must address American Canyon's argument that some or all of Vallejo's CEQA causes of action are barred for failure to exhaust administrative remedies. American Canyon accurately observes that exhaustion of administrative remedies is a jurisdictional prerequisite to maintaining a CEQA action (see *Save the Hill Group v. City of Livermore* (2022) 76 Cal.App.5th 1092, 1104-1105), and Vallejo's comments left something to be desired in terms of timing and precision. Vallejo responds—also accurately—that public comments need only "fairly apprise" the agency of an EIR's alleged deficiency. (*Planning & Conservation League v. Castaic Lake Water Agency* (2009) 180 Cal.App.4th 210, 251.) We need not decide whether Vallejo's comments were sufficiently specific for purposes of the exhaustion requirement, as we conclude American Canyon waived the requirement by failing to raise it in the trial court.

Exhaustion of administrative remedies is a jurisdictional prerequisite to maintaining a CEQA action, as we have said. (§ 21177; see also *Save the Hill Group v. City of Livermore, supra*, 76 Cal.App.5th at pp. 1104-1105.)[7] But "the failure to exhaust does not deprive a court of subject matter jurisdiction." (*Azusa Land Reclamation Co. v. Main San Gabriel Basin Watermaster* (1997) 52 Cal.App.4th 1165, 1216 ["cases that

---

[7] Section 21177, subdivision (a) provides: "An action or proceeding shall not be brought pursuant to Section 21167 unless the alleged grounds for noncompliance with this division were presented to the public agency orally or in writing any person during the public comment period provided by this division or before the close of the public hearing on the project before the issuance of the notice of determination."

11

describe the requirement as 'jurisdictional' simply stand for the unremarkable proposition that the court does not have the discretion to refuse to apply the doctrine in cases where it applies"] see also *Bains v. Department of Industrial Relations* (2016) 244 Cal.App.4th 1120, 1128 ["The doctrine of exhaustion of administrative remedies 'does *not* implicate subject matter jurisdiction but rather is a "procedural prerequisite" "originally devised for convenience and efficiency" and now "followed under the doctrine of *stare decisis* . . . ." [Citations.] It is "jurisdictional" only in the sense that a court's failure to apply the rule in a situation where the issue has been properly raised can be corrected by the issuance of a writ of prohibition' "].) Accordingly, failure to exhaust administrative remedies is generally considered an affirmative defense that can be waived at trial. (*Azusa, supra*, at p. 1216; see also *United Neighborhoods for Los Angeles v. City of Los Angeles* (2023) 93 Cal.App.5th 1074, 1090, fn. 15 [a public agency can waive its exhaustion defense to a CEQA action].) That is what happened here.

American Canyon said nothing about exhaustion of administrative remedies in the trial court and so failed to preserve the issue. (See generally *Green v. City of Oceanside* (1987) 194 Cal.App.3d 212, 222 [whether exhaustion is required "is not the sort of issue which should fall outside the general rule of civil litigation that arguments and objections not raised and preserved in the trial court are waived on appeal"]; see also *Cummings v. Stanley* (2009) 177 Cal.App.4th 493, 506 ["we find a waiver of a claim of exhaustion appropriate on appeal if the defense was not raised below"].) We can therefore pass over American Canyon's remaining exhaustion arguments and proceed to the merits.

    3.    *Analysis*

Our Supreme Court identified principles for evaluating an EIR's "analytical adequacy" in *Vineyard, supra*, 40 Cal.4th at page 428. That case concerned an EIR for a proposed master planned community with "more than 22,000 residential units, housing as many as 60,000 people, together with schools and parks, as well as office and commercial uses occupying 480 acres of land." (*Id.* at p. 422.) The primary issue was the adequacy

of the EIR's water supply analysis, which was alleged to be "deficient in that it 'fail[ed] to identify the actual source of most of the water needed to fill the project's long-term demand,' an analytical gap that 'serve[d] to obscure the undisclosed environmental impacts of the project.' " (*Id.* at p. 427.) As the Supreme Court put it, the "principal disputed issue" was "how firmly future water supplies for a proposed project must be identified or, to put the question in reverse, what level of uncertainty regarding the availability of water supplies can be tolerated in an EIR for a land use plan." (*Id.* at p. 428.)

In considering this issue, the Supreme Court reviewed several appellate decisions that "specifically addressed the sufficiency of an EIR's analysis of future water supplies." (*Vineyard, supra*, 40 Cal.4th at p. 428; see *id*. at pp. 428-430.) From these opinions, the high court distilled four principles for evaluating the sufficiency of an analysis of future water supplies under CEQA. (*Id.* at pp. 430-432.) First, the court explained, an EIR is inadequate if it "simply ignores or assumes a solution to the problem of supplying water to a proposed land use project. Decision makers must, under the law, be presented with sufficient facts to 'evaluate the pros and cons of supplying the amount of water that the [project] will need.' " (*Vineyard, supra*, at p. 431.)

Second, the *Vineyard* court said, "future water sources for a large land use project and the impacts of exploiting those sources are not the type of information that can be deferred for future analysis. An EIR evaluating a planned land use project must assume that all phases of the project will eventually be built and will need water, and must analyze, to the extent reasonably possible, the impacts of providing water to the entire proposed project." (*Vineyard, supra*, 40 Cal.4th at p. 431.)

"Third," the *Vineyard* court continued, "the future water supplies identified and analyzed must bear a likelihood of actually proving available; speculative sources and unrealistic allocations ('paper water') are insufficient bases for decisionmaking under CEQA. [Citation.] An EIR for a land use project must address the impacts of *likely*

13

future water sources, and the EIR's discussion must include a reasoned analysis of the circumstances affecting the likelihood of the water's availability." (*Vineyard, supra*, 40 Cal.4th at p. 432.)

"Finally," the *Vineyard* court concluded, "where, despite a full discussion, it is impossible to confidently determine that anticipated future water sources will be available, CEQA requires some discussion of possible replacement sources or alternatives to use of the anticipated water, and of the environmental consequences of those contingencies." (*Vineyard, supra*, 40 Cal.4th at p. 432.)

Even as the Supreme Court announced these principles, however, it was careful to note that none of the authorities from which they were derived either held or suggested that an EIR must demonstrate the project "is definitely assured water through signed, enforceable agreements with a provider and already built or approved treatment and delivery facilities." (*Vineyard, supra*, 40 Cal.4th at p. 432.) To the contrary, the court explained: "Requiring certainty when a long-term, large-scale development project is initially approved would likely be unworkable, as it would require water planning to far outpace land use planning." (*Ibid.*) Thus, an EIR need only show that water is reasonably likely to be available from an identified source. (*Id.* at p. 446.)

Yet another set of standards is relevant here. Section 15155 of the Guidelines was adopted in the wake of the Supreme Court's decision in *Vineyard, supra.* (Guidelines, § 15155, Register 2007, No. 30 (July 27, 2007); see also *Madera Oversight Coalition, Inc. v. County of Madera* (2011) 199 Cal.App.4th 48, 98, disapproved on other grounds in *Neighbors for Smart Rail v. Exposition Metro Line Construction Authority* (2013) 57 Cal.4th 439, 457 (*Neighbors for Smart Rail*).) Subsection (f), added some 11 years later (Guidelines, § 15155, Register 2018, No. 52 (Dec. 28, 2018)), provides: "The degree of certainty regarding the availability of water supplies will vary depending on the stage of project approval. A lead agency should have greater confidence in the availability of water supplies for a specific project than might be required for a conceptual plan (i.e.

14

general plan, specific plan). An analysis of water supply in an environmental document may incorporate by reference information in a water supply assessment, urban water management plan, or other publicly available sources. The analysis shall include the following: [¶] (1) Sufficient information regarding the project's proposed water demand and proposed water supplies to permit the lead agency to evaluate the pros and cons of supplying the amount of water that the project will need. [¶] (2) An analysis of the reasonably foreseeable environmental impacts of supplying water throughout all phases of the project. [¶] (3) An analysis of circumstances affecting the likelihood of the water's availability, as well as the degree of uncertainty involved. Relevant factors may include but are not limited to, drought, salt-water intrusion, regulatory or contractual curtailments, and other reasonably foreseeable demands on the water supply. [¶] (4) If the lead agency cannot determine that a particular water supply will be available, it shall conduct an analysis of alternative sources, including at least in general terms the environmental consequences of using those alternative sources, or alternatives to the project that could be served with available water." (Guidelines, § 15155, subd. (f).)

Vallejo generally argues the EIR violates CEQA by failing to comply with *Vineyard* and section 15155, subdivision (f) of the Guidelines. We now turn to the specifics of the EIR's alleged deficiencies.

### a. *The Amount of Water Actually Purchased (First Cause of Action)*

Vallejo argues the EIR violates CEQA by failing to disclose amounts of water actually purchased by American Canyon under the 1996 Agreement. According to Vallejo, the omission rendered the EIR's discussion of future water supplies speculative and unrealistic, in violation of the third *Vineyard* principle, that future water supplies must bear a likelihood of actually proving available. We disagree. Some additional background is helpful to understand why.

The 1996 Agreement originally authorized American Canyon to purchase as much as 629 acre feet of Vallejo treated water per year, with an option to purchase larger

15

amounts in five year increments through 2021. "Ultimately," the water supply assessment explains, "this results in a total of 3,206 acre-feet of treated water available for purchase each year." Vallejo does not seriously dispute this.[8] Instead, Vallejo argues the EIR should have disclosed that American Canyon actually only purchased 2,074 acre feet of Vallejo treated water, some 1,132 acre-feet less than the contracted amount.

To reiterate, Vallejo argues the EIR's failure to disclose amounts of water actually purchased—as opposed to amounts available for purchase—rendered the EIR's discussion of future water supplies speculative and unrealistic, in violation of the third *Vineyard* principle. (See *Vineyard, supra*, 40 Cal.4th at p. 432.) That principle derives from *Santa Clarita Organization for Planning the Environment v. County of Los Angeles* (2003) 106 Cal.App.4th 715, 718-719 (*Santa Clarita*), in which the appellate court considered an EIR for a mixed use residential and commercial development featuring "2,545 housing units, 180,000 square feet of commercial retail space and 46 acres of community facilities." (*Id.* at p. 718.) The EIR assumed the Castaic Lake Water Agency would receive its full entitlement of 54,200 acre-feet of water from the State Water Project and would have the ability to purchase another 41,000 acre-feet of water from the State Water Project through another agency. (*Id.* at pp. 718, 721.) But the State Water Project had not been fully constructed, and it was common knowledge that there was "a vast difference between entitlements and the amount of water that [the State Water Project] [could] actually deliver." (*Id.* at p. 722; see *id.* at pp. 721-722.) Consequently, the entitlements represented " 'paper water,' " rather than a reliable source of supply. (*Id.*

---

[8] Vallejo's opening brief asserts 3,206 acre-feet of Vallejo treated water would not be available under the 1996 Agreement because American Canyon has not exercised its option to purchase that amount in past years. However, Vallejo does not support the contention with any apposite citation to the administrative record and does not suggest that American Canyon could not exercise its option to purchase more Vallejo treated water if it wished to do so.

16

at p. 721 [" 'The entitlements represent nothing more than hopes, expectations, water futures or, as the parties refer to them, "paper water" ' "]; see also *Planning & Conservation League v. Department of Water Resources* (2000) 83 Cal.App.4th 892, 914, fn. 7 ["Paper water always was an illusion. 'Entitlements' is a misnomer, for contractors surely cannot be entitled to water nature refuses to provide or the body politic refuses to harvest, store, and deliver"].) The EIR failed to discuss the "vast difference" between what was promised and what could be delivered and so failed to fulfill its informational purpose. (*Santa Clarita, supra*, at p. 722.) This case is different.

Unlike the petitioners in *Santa Clarita*, Vallejo has given us no reason to believe the EIR relies on " 'paper water.' " (*Santa Clarita, supra*, 106 Cal.App.4th at p. 721.) Although Vallejo presumably has ready access to information that would allow us to compare American Canyon's demands for water under the 1996 Agreement and available supplies, no such information appears in the record. Consequently, we have no way of assessing whether the EIR's assumptions are unrealistic or future water supplies are speculative or unreliable. Nor do we have any way of determining whether there exists any difference at all—let alone a "vast difference"—between what Vallejo has promised under the 1996 Agreement and what American Canyon can reasonably expect to receive. To the contrary, the record indicates American Canyon has historically received "100 percent of the full contracted volume" of Vallejo permit water for all but one year since 1999, and Vallejo water of all types is considered more reliable than water from the State Water Project. The record also indicates that American Canyon typically purchases less than the full contracted amounts of Vallejo water for reasons other than lack of supply.

The EIR appropriately relies on American Canyon's urban water management plan for 2015 (the 2015 plan). (See generally Guidelines, § 15155, subd. (f) ["An analysis of water supply in an environmental document may incorporate by reference information in a water supply assessment, urban water management plan, or other publicly available sources"]; see also *Vineyard, supra*, 40 Cal.4th at pp. 446-447 ["long-term local water

17

planning is not a burden that must be taken up anew, for CEQA purposes, each time a development is proposed; rather, cities and counties may rely on existing urban water management plans, so long as the expected new demand of the [project] was included in the water management plan's future demand accounting" ].)

The 2015 plan explains: "While Vallejo Treated Water is a reliable source of supply, due to its higher cost of purchase, [American Canyon] typically uses less than the full allotment of this supply." The 2015 plan thus indicates American Canyon could purchase more than 2,074 acre-feet of Vallejo treated water under the 1996 Agreement, but "typically" chooses not to do so. That does not mean American Canyon's "entitlement" to Vallejo treated water is speculative or unrealistic; it may just be expensive. Regardless, Vallejo has not shown future water supplies were uncertain or unlikely to be available. In the absence of any such showing, we cannot say that the EIR was legally inadequate for failing to disclose differences between contracted amounts and amounts delivered. The trial court properly denied the petition with respect to the first cause of action.

b. *Place of Use Restrictions (Second Cause of Action)*

Vallejo next argues the EIR violated section 15155, subdivision (f)(3) of the Guidelines by failing to discuss place of use restrictions associated with License 7848. Vallejo's argument rests on two premises. First, Vallejo argues only License 7848 water can be used to satisfy its obligations under the 1996 Agreement. Second, Vallejo argues License 7848 water can only be delivered to areas within the place of use authorized by the license, which does not include the project site. The first premise appears to be disputed, but that dispute does not affect our analysis here.[9] The second is undisputed. That brings us to the question whether the EIR was legally inadequate for failing to

_____

[9] American Canyon apparently contends Vallejo could satisfy its obligations under the 1996 Agreement with water from any source.

18

discuss License 7848's place of use restrictions. The trial court determined no such discussion was necessary, and we are compelled to agree.

Vallejo argues discussion of License 7848's place of use restrictions was required by section 15155, subdivision (f)(3) of the Guidelines, which calls for "[a]n analysis of circumstances affecting the likelihood of the water's availability, as well as the degree of uncertainty involved." According to Vallejo, the place of use restrictions were a "key limiting factor" affecting "a significant water supply" in American Canyon's water supply portfolio. That may be so. But that does not mean the EIR's failure to discuss place of use restrictions amounts to an actionable abuse of discretion.

Everyone agrees License 7848's place of use restrictions preclude delivery of License 7848 water to the project site. In that limited sense, we suppose the restrictions can be fairly characterized as "circumstances affecting the likelihood of the water's availability," which would warrant analysis in the EIR's water supply assessment. (Guidelines, § 15155, subd. (f)(3).) However, License 7848's place of use restrictions are different from "drought, salt-water intrusion, regulatory or contractual curtailments, and other reasonably foreseeable demands on the water supply." (*Ibid.*) Unlike any of those circumstances, all of which would reduce the volume of water available to the public water system, the place of use restrictions do not reduce the overall volume of water; they merely limit the areas within American Canyon that can receive that water. In that broader sense, we are inclined to believe the place of use restrictions are not "circumstances affecting the likelihood of the water's availability," so much as circumstances affecting the areas within American Canyon where License 7848 water may be properly used. Use being different from availability, we are not convinced section 15155, subdivision (f)(3) of the Guidelines necessarily calls for an analysis of License 7848's place of use restrictions. We need not decide that question, however, because even assuming they should have been discussed, Vallejo does not show prejudice.

"Although an agency's failure to disclose information called for by CEQA may be prejudicial 'regardless of whether a different outcome would have resulted if the public agency had complied' with the law (§ 21005, subd. (a)), under CEQA 'there is no presumption that error is prejudicial' (*id.,* subd. (b))." (*Neighbors for Smart Rail, supra*, 57 Cal.4th at p. 463; see also *Association of Irritated Residents v. County of Madera* (2003) 107 Cal.App.4th 1383, 1391 ["Noncompliance with CEQA's information disclosure requirements is not per se reversible; prejudice must be shown"].) " 'A prejudicial abuse of discretion occurs if the failure to include relevant information precludes informed decisionmaking and informed public participation, thereby thwarting the statutory goals of the EIR process.' " (*Neighbors for Smart Rail, supra*, at p. 463.) We do not believe License 7848's place of use restrictions are relevant to the EIR's discussion of future water supplies, given that License 7848 water will not be used for the Project. It follows that the failure to discuss them could not have thwarted the statutory goals of the EIR process.

The EIR was sufficiently detailed to allow decision makers to evaluate the pros and cons of supplying the Project's water needs, even without an analysis of License 7848's place of use restrictions. (See *Vineyard, supra*, 40 Cal.4th at p. 431 ["Decision makers must, under the law, be presented with sufficient facts to 'evaluate the pros and cons of supplying the amount of water that the [project] will need' "]; see also Guidelines, § 15155, subd. (f)(1) [Water supply assessments must include: "Sufficient information regarding the project's proposed water demand and proposed water supplies to permit the lead agency to evaluate the pros and cons of supplying the amount of water that the project will need"].) The EIR identified and analyzed future water supplies on a citywide basis. It estimated the Project's anticipated water demand and compared those

estimates with demand assumptions for the project area in the 2015 plan.[10] It then compared anticipated citywide water demand to projected citywide supplies in "normal year," "single dry year," and "multiple dry year" scenarios through 2040. The EIR ultimately concluded that total projected water supplies would be sufficient to meet total projected demand in all years and all scenarios.[11] Substantial evidence supports that conclusion, and Vallejo does not attempt to argue otherwise.

That additional information may have been desirable or even helpful does not mean it was necessary to informed decisionmaking or informed public participation, especially given the place of use restrictions would only affect the areas within American Canyon where License 7848 water could be used, and not the quantity of License 7848 water available to American Canyon as a whole. (See, e.g., *Laurel Heights, supra*, 47 Cal.3d at p. 415 ["A project opponent . . . can always imagine some additional study or analysis that might provide helpful information. It is not for them to design the EIR. That further study . . . might be helpful does not make it necessary"].) We therefore conclude the omission was insubstantial or technical, and any violation of section 15155, subdivision (f)(3) of the Guidelines was harmless. (*Neighbors for Smart Rail, supra*, 57 Cal.4th at p. 463 ["Insubstantial or merely technical omissions are not grounds for relief"]; *Association of Irritated Residents v. County of Madera, supra*, 107 Cal.App.4th at p. 1391.) The trial court properly denied the petition with respect to the second cause of action.

---

[10] The 2015 plan assumed the parcel would eventually be developed for an industrial use requiring more water than the Project.

[11] The EIR anticipates that demand will exceed supply during some dry years, but American Canyon will be able to meet that demand through the use of carryover water from the State Water Project (that is, water left over from earlier annual allotments), demand reductions, and/or additional purchases on the open market.

*c.* *Impact of Emergency Curtailment Orders (Third Cause of Action*)

Vallejo next argues the EIR violated section 15155, subdivision (f) of the Guidelines by: (1) failing to provide monthly curtailment projections; (2) failing to discuss the risk of "simultaneous curtailment"; and (3) failing to analyze alternative water sources during periods of curtailment. We consider each argument in turn.

*i.* *Monthly Curtailment Projections*

Vallejo argues the EIR should have considered the availability of License 7848 water on a monthly rather than annual basis. Vallejo observes that License 7848 water was entirely curtailed—that is, reduced to zero—for nearly five full months between June and October 2015, and Vallejo expects similar curtailments will occur in critically dry years in the future. Although the EIR mentions the earlier curtailment and assumes that American Canyon would not receive full contracted amounts of Vallejo water in dry years, Vallejo insists an "analytically complete" assessment would additionally require some discussion of the possibility that "one of American Canyon's key water supplies could be unavailable for a third of the year." According to Vallejo, that discussion should have taken place by means of monthly curtailment projections. We are not persuaded.

Vallejo again relies on section 15155, subdivision (f)(3) of the Guidelines. As previously discussed, subdivision (f)(3) requires "[a]n analysis of circumstances affecting the likelihood of the water's availability, as well as the degree of uncertainty involved." (Guidelines, § 15155, subd. (f)(3).) Subdivision (f)(3) specifically identifies "drought" and "regulatory or contractual curtailments" as factors relevant to the required analysis. (*Ibid.*) But subdivision (f)(3) does not require monthly curtailment projections, and we cannot interpret the regulation to impose "procedural or substantive requirements beyond those explicitly stated" by CEQA or the Guidelines. (§ 21083.1 ["courts, consistent with generally accepted rules of statutory interpretation, shall not interpret [CEQA] or [the] guidelines . . . in a manner which imposes procedural or substantive requirements beyond

those explicitly stated"].) We reject Vallejo's contention that the Guidelines somehow required monthly curtailment projections.[12]

Even assuming that monthly curtailment projections would have been helpful, they were not required, and American Canyon was thus free to present the curtailment projections on an annual basis. (*Tiburon Open Space Committee v. County of Marin, supra*, 78 Cal.App.5th at p. 726 ["Much of what goes into an EIR is left to the discretion of the agency preparing it"].)

ii.     *Risk of "Simultaneous Curtailment"*

Vallejo next argues the EIR should have discussed the risk of "simultaneous curtailment." Vallejo observes that American Canyon's imported water supplies are delivered through the North Bay Aqueduct.[13] Vallejo also observes that simultaneous curtailments of water supplies to American Canyon and Vallejo would have a significant effect on American Canyon's water supply portfolio. Vallejo argues section 15155, subdivision (f) of the Guidelines generally requires that the EIR discuss the risk of "simultaneous curtailment." We disagree.

---

[12] Vallejo also directs our attention to California Code of Regulations, title 23, section 929, which sets forth annual reporting requirements for water rights license holders. Among other things, that regulation requires that annual reports specify "[t]he amount of water taken from the source from each point of diversion in each month (or shorter period if otherwise required), including direct diversion amount, amount collected to storage, and the total amount of water diverted during the twelve month reporting period." (*Id.* at subd. (c)(5).) These reporting requirements do not apply to the EIR's water supply assessment and Vallejo does not suggest otherwise.

[13] The North Bay Aqueduct is an infrastructure component of the State Water Project. (*State Water Resources Control Board Cases* (2006) 136 Cal.App.4th 674, 693.) Water from the State Water Project is diverted from the Sacramento-San Joaquin Delta and conveyed approximately 21 miles through the North Bay Aqueduct to the Cordelia Forebay, just outside Vallejo. Water from the Delta is also conveyed through the North Bay Aqueduct for municipal use in Solano County. (*Ibid.*)

The EIR makes no secret of the fact that American Canyon receives imported water from the State Water Project and Vallejo, and both sources come from the Delta watershed through the North Bay Aqueduct. The EIR also discusses the possibility that water from either source might be curtailed, and supply reductions in Vallejo could lead to proportionate reductions to American Canyon. The EIR also incorporates the 2015 plan, which states both sources are subject to the same or similar environmental and water quality factors (since both "come[] from the Delta via the North Bay Aqueduct"), and both face the same climactic and hydrologic constraints (e.g., drought conditions). The EIR also describes American Canyon's contingency planning for single and multiyear drought scenarios and explains that American Canyon has an agreement with the City of Napa for the purchase of potable water "under emergency conditions, or when the [North Bay Aqueduct] is offline for maintenance or other reasons."

Although the EIR does not specifically discuss "simultaneous curtailments," it clearly discloses the role of the North Bay Aqueduct and adequately alerts decisionmakers to the possibility that conditions affecting the availability of imported water from the State Water Project could similarly affect the availability of imported Vallejo water. On the record before us, we conclude the EIR adequately discloses the risk of "simultaneous curtailments."

### iii. *Analysis of Alternative Sources*

Vallejo next argues the EIR violates section 15155, subdivision (f)(4) of the Guidelines by failing to analyze "alternative sources." Vallejo does not appear to have raised this argument in the trial court and thus appears to have forfeited it. (See *Bitner v. Department of Corrections & Rehabilitation* (2023) 87 Cal.App.5th 1048, 1065 ["Having failed to raise or develop this issue in the trial court, plaintiffs cannot raise the issue for the first time on appeal"]; *Howitson v. Evans Hotels, LLC* (2022) 81 Cal.App.5th 475, 489 ["the failure to raise an issue in the trial court typically forfeits on appeal any claim of error based on that issue"].) Regardless, the argument fails.

24

Section 15155, subdivision (f)(4) of the Guidelines provides: "If the lead agency cannot determine that a particular water supply will be available, it shall conduct an analysis of alternative sources, including at least in general terms the environmental consequences of using those alternative sources, or alternatives to the project that could be served with available water." Subdivision (f)(4) does not apply here. American Canyon concluded that particular water supplies *would* be available to meet the Project's needs, and Vallejo does not raise any meaningful challenge to the sufficiency of the evidence supporting that conclusion. We would therefore be inclined to conclude that section 15155, subdivision (f)(4) of the Guidelines was inapplicable, had the issue been preserved (which does not appear to have been the case). The trial court properly denied the petition as to the third cause of action.

### d. The Contract Litigation (Fourth Cause of Action)

Vallejo argues the EIR violates CEQA by failing to discuss the contract litigation. According to Vallejo, the contract litigation is "directly relevant to the reliability of American Canyon's water supply during drought conditions" and "integral to the future of American Canyon's water supply." But the record does not contain any information about the contract litigation, other than counsel's representations that the dispute has something to do with differing interpretations of the 1996 Agreement. "Without such information," the trial court said, it was not possible to determine whether "the outcome of that lawsuit could potentially undermine the EIR's conclusion that there will be an available and sufficient water supply for the project." Vallejo has done nothing to augment the record on appeal. Consequently, we are also unable to evaluate the significance of the contract litigation. Having failed to provide us with an adequate record, Vallejo has also failed to show the trial court erred. (See *Jameson v. Desta* (2018) 5 Cal.5th 594, 609 [" 'Failure to provide an adequate record on an issue requires that the issue be resolved against [the appellant]' "].) We therefore conclude the trial court properly denied the petition with respect to the fourth cause of action.

25

B.    *Water Code (Fifth Cause of Action*)

Vallejo next argues the water supply assessment fails to comply with sections 10910 and 10911 of the Water Code.  Specifically, Vallejo argues the water supply assessment violates section 10910, subdivision (d)(1) of the Water Code by: (1) failing to identify License 7848 as the source of American Canyon's Vallejo water; (2) failing to discuss License 7848's place of use restrictions; and (3) failing to identify quantities of Vallejo water received in prior years pursuant to the 1996 Agreement.  Vallejo additionally argues the water supply assessment violates section 10911, subdivision (a) of the Water Code by failing to establish a contingency plan for insufficient water supplies.  We will consider these arguments momentarily.  Before doing so, however, we must decide whether Vallejo's Water Code cause of action is justiciable.

1.    *Justiciability*

American Canyon argues the Water Code cause of action is nonjusticiable.  American Canyon finds support for this position in *California Water Impact Network v. Newhall County Water Dist.* (2008) 161 Cal.App.4th 1464 (*California Water*).  American Canyon's reliance on *California Water* proves too much.

In *California Water*, the City of Santa Clarita (City) asked the Newhall County Water District (Water District) to prepare a water supply assessment as part of the EIR and CEQA review process for an industrial park.  (*California Water, supra*, 161 Cal.App.4th at pp. 1472-1473.)  An environmental organization—C-WIN—filed a petition for a peremptory writ of mandate, arguing the water supply assessment was deficient and misleading in various respects.  (*Id.* at p. 1474.)  Crucially, though, the petition was filed before the City had an opportunity to review and incorporate the water supply assessment into the EIR.  (*Ibid*.)

The City and Water District moved for judgment on the pleadings, arguing: (1) the water supply assessment was a "technical informational document and not a final act or determination" subject to judicial review; and (2) C-WIN failed to exhaust administrative

remedies. (*California Water, supra*, 161 Cal.App.4th at pp. 1474-1475.) The trial court granted the motion without reaching the merits of the petition. (*Id.* at p. 1475.) The Court of Appeal for the Second District, Division 7, affirmed.

The *California Water* court explained that water supply assessments do not require the water supplier to provide water services to the project, but merely serve as technical, informational, or advisory opinions, "akin to that of other informational opinions provided by other entities concerning potential environmental impacts – such as traffic, population density or air quality." (*California Water, supra*, 161 Cal.App.4th at p. 1486.) As such, the *California Water* court reasoned that water supply assessments are "but an interlocutory and preliminary step in the EIR process," and "not a final agency decision, determination or action as that term is used in the context of mandamus relief." (*Id.* at pp. 1486, 1488.) The water supply assessment in *California Water* never advanced beyond this "preliminary step," and so was not final for purposes of mandamus review. (*Id.* at pp. 1474, 1487-1488.) The same is not true here.

Unlike the water assessment in *California Water,* the instant water supply assessment was evaluated by the lead agency, incorporated into the EIR, and certified. Consequently, we are not confronted with the same finality and exhaustion concerns as the *California Water* court. (*California Water, supra*, 161 Cal.App.4th at pp. 1485-1490.) Neither *California Water* nor any other case mentioned in American Canyon's briefing addresses the justiciability of an alleged violation of the Water Code in a water supply assessment that has been incorporated into an EIR and certified by the lead agency. We therefore reject American Canyon's nonjusticiability argument and proceed to the merits. (*California Building Industry Assn. v. State Water Resources Control Bd.* (2018) 4 Cal.5th 1032, 143 ["It is axiomatic that cases are not authority for propositions that are not considered"].)

##### 2. *Water Code Section 10910, Subdivision (d)(1)*

Vallejo argues the water supply assessment fails to comply with Water Code section 10910, subdivision (d)(1), which requires "an identification of any existing water supply entitlements, water rights, or water service contracts relevant to the identified water supply for the proposed project, and a description of the quantities of water received in prior years by the public water system." Specifically, Vallejo argues the water supply assessment violates subdivision (d)(1) of Water Code section 10910 by failing to adequately identify the 1996 Agreement and failing to sufficiently describe "quantities of water received in prior years." We take each argument in turn.

Vallejo argues a "proper identification" of the 1996 Agreement "would include specific details about License 7848, including its identification number, priority date, diversion limitations, place-of-use restrictions, and historical curtailments." But Water Code section 10910 does not require any of these things. Instead, Water Code section 10910, subdivision (d)(2) requires only that the "identification" be demonstrated "by providing information related to . . . [¶] (A) Written contracts or other proof of entitlement to an identified water supply."

The water supply assessment provides the following information "related to" the 1996 Agreement: "In 1996, the City entered into an agreement with the City of Vallejo to allow the purchase of additional water supply." Though not required by Water Code section 10910, subdivision (d)(1), the water supply assessment goes on to say: "Vallejo holds an appropriative right for Sacramento Bay-Delta water from the State Water Resources Control Board that pre-dates the construction of the [State Water Project]." Vallejo does not explain how or why the water supply assessment's "identification" of the 1996 Agreement was deficient under Water Code section 10910, subdivision (d)(1), and we decline to so hold.

Vallejo's challenge to the water supply assessment's description of quantities of water received in prior years is equally unavailing. As before, Vallejo argues the water

28

supply assessment should have specified the quantities of Vallejo water that American Canyon actually received pursuant to the 1996 Agreement, rather than just the quantities of water available for purchase. However, the water supply assessment relies on the 2015 plan, which includes multiple charts describing quantities of water received in prior years. Vallejo does not explain why the information provided was insufficient and thus fails to demonstrate error.

3. *Water Code Section 10911, Subdivision (a)*

Finally, Vallejo argues the water supply assessment fails to comply with Water Code section 10911, subdivision (a), which provides, in pertinent part: "If, as a result of its assessment, the public water system concludes that its water supplies are, or will be, insufficient, the public water system shall provide to the city or county its plans for acquiring additional water supplies, setting forth the measures that are being undertaken to acquire and develop those water supplies." Specifically, Vallejo argues the water supply assessment should have concluded water supplies would be insufficient and thus should have included plans for acquiring additional water supplies. The argument fails at its premise.

Water Code section 10911, subdivision (a) only requires "plans for acquiring additional water supplies" when the local agency or public water systems determines that water supplies will be insufficient. No such determination was made here. Consequently, there was no need to include a discussion of plans for acquiring additional supplies. The trial court properly denied the petition with respect to the fifth cause of action.

## III. DISPOSITION

The judgment is affirmed.  Respondents City of American Canyon and Buzz Oates, LLC shall recover their costs on appeal.  (Cal. Rules of Court, rule 8.278(a)(1) & (2).)

/S/

_____

RENNER, J.

We concur:

/S/

_____

ROBIE, Acting P. J.

/S/

_____

WISEMAN, J.*

_____

* Retired Associate Justice of the Court of Appeal, Fifth Appellate District, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.